299 F.3d 1019
 CADILLAC FAIRVIEW/CALIFORNIA, INC., Plaintiff,
v.
DOW CHEMICAL COMPANY, Defendant-third-party-plaintiff-Appellee,
v.
United States of America, Defendant-third-party-defendant-Appellant.
 No. 99-56641.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted February 8, 2001.
 Filed August 6, 2002.
 
 COPYRIGHT MATERIAL OMITTED Jeffrey C. Dobbins, Department of Justice, Environment & Natural Resources Division, Washington, D.C., for the appellant.
 Edward W. Warren, Kirkland & Ellis, Washington, D.C., for the appellee.
 Appeal from the United States District Court for the Central District of California; Mariana R. Pfaelzer, District Judge, Presiding. D.C. No. CV-83-07996-MRP (Bx).
 Before D.W. NELSON, O'SCANNLAIN, and KLEINFELD, Circuit Judges.
 OPINION
 KLEINFELD, Circuit Judge.
 
 
 1
 This is a CERCLA dispute about whether the federal government can make a company that discharged pollutants into the soil at the government's direction and under its control during World War II, in a war production plant, pay part of the cost of cleaning them up.
 
 Facts
 
 2
 In 1942, the Japanese had conquered almost all of the world's major natural rubber-producing areas in Southeast Asia. The Germans had perfected a synthetic rubber substitute, Buna-S, which they were manufacturing as quickly as possible at several plants, including the I.G. Farben plant in Auschwitz that used Jewish slaves.[1] American manufacture had been retarded by the Depression, which reduced demand for rubber, and by a cooperative research agreement Standard Oil had made with I.G. Farben in 1927, during the Weimar period.[2] As a result of the rubber shortage, tires had to be strictly rationed in the United States to preserve rubber for such myriad military uses as truck and aircraft tires and tubes, tank treads, equipment hoses and belts, footwear, medical supplies, life rafts, flotation equipment, barrage balloons, waterproof equipment, landing boats, gas masks and wire insulation.
 
 
 3
 The war was not going well in 1942, until the Battle of Midway in June. Germany had conquered continental Europe, and Japan had conquered much of the Pacific. Japan invaded and occupied part of the United States, the Attu and Kiska islands in Alaska, from June of 1942 until the terrible Battle of Attu in May of 1943, which took a commitment of 100,000 men and cost 3,829 casualties just in the landing force.[3]
 
 
 4
 Then-Senator Truman chaired hearings on why our country was unprepared to meet its critical need for rubber. President Roosevelt established a committee of three, Bernard Baruch as chairman, along with the presidents of Harvard and M.I.T., to investigate and "recommend such action as will produce the rubber necessary for our total war effort."[4] The Baruch Committee reported that 90% of our prewar sources of natural rubber had been lost to Japan, and we had no substantial synthetic rubber industry.[5] "Of all critical and strategic materials, rubber is the one which presents the greatest threat to the safety of our nation and the success of the Allied cause.... [I]f we fail to secure quickly a large new rubber supply our war effort and our domestic economy both will collapse."[6] Baruch told industry representatives that the rubber program would be their job, and that "the bottleneck of the whole program would certainly be butadiene."[7]
 
 
 5
 Pursuant to this need for synthetic rubber, the government took steps to create, overnight, an industry to produce it. Acting through a series of agencies (referred to here as the "Rubber Reserve"), the government entered into agreements to finance and retain ownership of manufacturing facilities, which private companies would lease from the government and operate in exchange for management fees and royalties. The Rubber Reserve would pay all operating expenses. The companies would provide knowledge, management and use of their patents. The planning emphasized production of Buna-S synthetic rubber. Buna-S was made by attaching (or "polymerizing") molecules of butadiene (made from grain alcohol or petroleum) and styrene (made from ethylene and benzene). Dow Chemical was especially important to the war effort, as it was the only commercial producer of styrene, and therefore the only company able to provide practical experience with styrene production.
 
 
 6
 This case arises out of a facility in Torrance, California, one of the most important synthetic rubber facilities at the time. Constructed in 1942, the 280-acre facility contained two rubber copolymerization plants (operated by Goodyear and the U.S. Rubber Co. (now Uniroyal), the "Rubber Companies"), a butadiene plant operated by Shell Oil, and a styrene plant operated by Dow Chemical.
 
 
 7
 In the terminology then used, the Torrance styrene plant was an "agent plant" — not a "contract plant." This meant that Dow agreed to operate the government-owned styrene plant as the "agent" of the United States and "at the expense and risk" of the United States. Dow built the facility, but the Rubber Reserve coordinated all phases of construction and made, approved, or ratified all significant operating decisions. The government owned the land; the government owned the plant; the government owned the raw materials; the government owned the byproducts and wastes; and the government owned the rubber. All activities at the site were subject to unrestricted control by the Rubber Reserve. Dow, as the company with the most expertise managing the facility, was required by its contract with the government to "carry out the orders, instructions, and specifications of Rubber Reserve." The government required monthly reports from Dow that included the volume of residues dumped. Under its contract with the government, Dow was entitled to reimbursement for the expense of waste disposal, so it had no financial incentive to use a cheap but dirty method rather than a clean but expensive method.
 
 
 8
 The production of rubber created toxic waste. Dow built evaporation ponds for aqueous wastes, such as aluminum chloride sludge, and dug pits for other wastes, such as sulfur and aluminum chloride tars. The government and Dow knew they were polluting the soil and, on account of runoff, the water, but the government made a policy decision not to divert scarce resources from the war effort to stop the pollution. As one government consultant reported:
 
 
 9
 During this period, it was recognized that some raw and partially processed materials were lost into waste waters leaving the plants, and that some of these substances were causing a stream pollution problem. However, personnel could not be diverted from more pressing objectives to study the complex problems related to waste prevention or treatment — nor could construction materials be secured for such purposes.
 
 
 10
 Dow subsequently developed better ways to dispose of the waste and closed the disposal pits in 1947.
 
 
 11
 As part of the operating agreement entered into in 1942, the government signed a broad "hold harmless" agreement, protecting Dow Chemical from any liability to anyone for any damages to property:
 
 
 12
 It is understood that in the performance of [these] contract[s,] [Dow] shall in no event be liable for, but shall be held harmless by [the United States] against, any damage to or loss or destruction of property (whether owned by [the United States] or others) or any injury to or death of persons, in any manner, arising out of or in connection with the work hereunder....
 
 
 13
 After the war, in 1948, the operating agreement, with this broad hold harmless clause, was renewed. The Rubber Reserve interpreted this hold harmless agreement in its manual to indemnify Dow for any losses for which the United States would not reimburse Dow for the cost of insurance coverage. During the War, the Rubber Reserve paid a claim for deaths and illnesses of numerous cows from pollution from the plant, based on its interpretation of its obligation to pay pollution damages under its contract with Dow. The government participated in the decision about how to dispose of the sulfur tars, the byproduct of Buna-S production, and, with unrestricted control over what was done, decided that disposal in pits was the best way to do it. Government inspectors and consultants studied Dow's sulfur sludge pits at the Torrance plant and approved them.
 
 
 14
 Dow operated the facility until 1955, when the Rubber Reserve sold the Torrance facility to Shell Oil. Shell made synthetic rubber there until 1972, when it sold the site. Eventually ownership passed to a developer, Cadillac Fairview/ California, Inc. Most of the plants were demolished, and the site is currently occupied by commercial and industrial facilities.
 
 
 15
 In 1980, 35 years after the war ended and eight years after rubber production ended, Congress enacted the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA).[8] Under CERCLA, the Environmental Protection Agency (EPA) has broad authority to provide for remediation of sites contaminated by hazardous waste by conducting the cleanup itself or requiring liable parties to do so. Regardless of who performs the cleanup, financial liability lies with the parties responsible for the contamination. CERCLA allows any responsible party to seek contribution from other responsible parties[9] and allows the district court to equitably apportion cleanup costs among liable parties.[10]
 
 
 16
 In 1983, Cadillac Fairview/California, the developer that bought the site at issue here, sued Dow Chemical, the United States, Shell Oil, and several rubber companies for damages to cover the expenses of investigating the soil pollution, and for an injunction and declaratory judgment. The United States crossclaimed against Dow and the other companies. Dow counterclaimed for indemnity and contribution under CERCLA. The United States settled with the mesne owners after it sold the property and before Cadillac Fairview bought it.
 
 
 17
 This complex litigation has come before us twice before. We held, in 1988, that Cadillac Fairview did indeed state a claim upon which damages and injunctive relief could be granted, against an argument from the defendants that government action had to precede a private action, though we rejected the owner's claim to injunctive relief.[11]
 
 
 18
 In 1994, the litigation came before us again. Dow Chemical crossclaimed for contribution against the Rubber Companies that made the rubber at the site and pumped contaminated styrene to Dow for distilling to separate out the reusable chemicals from the waste that Dow dumped into the pits. The Rubber Companies had won summary judgment on the ground that they could not be liable for having "arranged for ... treatment" under CERCLA,[12] because they neither owned nor controlled the contaminated styrene — the government did. We held that the statute provided for "arranger" liability independently of ownership and that we had upheld liability against an arranger that did not control the process leading to the pollution, so a trier of fact could conclude that the Rubber Companies were "arrangers," and remanded.[13]
 
 
 19
 On remand, the district court granted partial summary judgment against Dow on the theory that it was an "operator" that could be liable for contribution under CERCLA. It then tried the issue of whether the United States, as well as the Rubber Companies, was also liable under CERCLA and how remedial costs should be allocated under section 113(f) of CERCLA among Dow, the Rubber Companies, and the United States. The trial resulted in findings of fact and conclusions of law, and a judgment that the United States should bear 100% of the remediation expense.
 
 
 20
 The district court found that "[t]he United States was informed and approved" of dumping the toxic tars into the pits and that its engineers "reviewed and approved" the dumping of the aqueous wastes into the sludge ponds, having been "fully informed during plant operations." The court found that because of the emergency conditions imposed by the War, the Rubber Reserve "made, approved or ratified all significant operating decisions." It obtained monthly reports on residues dumped, "directed and coordinated the operations of the plants," and "set policy on questions of trade waste disposal." Production (and consequent waste) was "in quantities directed by the Rubber Reserve." The Rubber Reserve in some respects (although not with regard to waste disposal) ordered changes in production techniques over Dow's recommendations to the contrary. The Executive Vice President of the Rubber Reserve had visited the Torrance plant and recommended disposing of wastes by getting them under the ground. "The United States was the ultimate authority over plant operations and was aware of, and acquiesced or actively participated in, the decisions concerning waste systems, including operation of the Pits and Ponds." Rubber Reserve officials had full and extensive knowledge of the waste pits and ponds, because they repeatedly inspected them and hired technical experts to advise the government on them. The waste disposal methods were "consistent with the state of knowledge and accepted industry practices of the time," and the only alternative at the time, burning the waste, was both impractical and more polluting. During and immediately after the War, when the pits were used for disposal, the government's contract with Dow prohibited Dow even from withdrawing from its arrangement with the government.
 
 
 21
 The district court held that the United States was liable for contribution as an owner, operator and arranger, and the Rubber Companies, Uniroyal and Goodyear, as arrangers. Although it did not enforce the government's hold harmless agreement as such, out of concern that under the Tucker Act only the Claims Court had jurisdiction to do so, it took the contract into account as an equitable factor under the CERCLA § 113 requirement that it "allocate response costs using such equitable factors as the court determines are appropriate."[14] The court took into account that Dow and the Rubber Companies acted pursuant to agreements that made them "agents" of the United States acting at the "risk and account" of the Rubber Reserve. Their handling of the wastes as "agents" whose acts were subject to the control of and were ratified by the United States would, as a matter of agency law, also entitle them to indemnity.
 
 
 22
 The district court rejected the government's argument that it should consider the benefits to the Rubber Companies of their participation, because the evidence was weak and such benefits as they might have obtained were overwhelmed by the benefits to the United States. And it rejected the government's proposed conclusion suggesting an equal division of responsibility with Dow. The district court concluded that "equity requires that 100% of the recoverable remedial costs incurred or to be incurred with respect to the Del Amo Pit Site by the United States, Dow and the Rubber Companies should be paid by the United States."
 
 
 23
 The United States appeals this allocation.
 
 Analysis
 
 24
 Under section 113 of CERCLA, the district court "may allocate response costs among liable parties using such equitable factors as the court determines are appropriate."[15] Thus, CERCLA "gives district courts discretion to decide what factors ought to be considered, as well as the duty to allocate costs according to those factors. We reverse only for an abuse of the discretion to select factors, or for clear error in the allocation according to those factors."[16] In this case, after close scrutiny of the record, we conclude that there was no such abuse of discretion or clear error, and we affirm.
 
 
 25
 A. Direct responsibility.
 
 
 26
 The government's first argument is that because Dow actually dug the pits after deciding where to dig them, transported the waste to the pits, deposited the waste in the pits, and maintained security at the pits, all without any direct federal orders or supervision telling Dow to do so, it should have been held liable for at least some portion of the cleanup costs.
 
 
 27
 Of course the government is correct that Dow actually disposed of the waste and exercised some discretion in how it did so. Its management expertise was the reason why the government used Dow to operate the plant instead of operating it itself. But, as the district court found, the government owned the site, the pits, the plant, and all materials including the wastes, knew just what Dow was doing, had unfettered control over it, approved of it, had an agency relationship with Dow that would ordinarily require it to indemnify Dow for what it did, and had made an express written promise to hold Dow harmless for whatever it did. On these facts (and allocation cases generally turn on their facts), there was no inequity in allocating 100% of the costs to the government. Indeed, where the government promises to hold a firm harmless for what it did, and then seeks to impose harm on the firm, highly unusual facts would be required to justify what would ordinarily be a gross inequity. In another war pollution case, United States v. Shell Oil Co.,[17] we affirmed a 100% allocation upon the United States for cleanup costs of wastes where private firms actually created the wastes and deposited them in the ground. To the extent that the case at bar is factually distinguishable, the distinctions make it an even more compelling one for such a 100% allocation.
 
 
 28
 B. Benefits to Dow.
 
 
 29
 The government next argues that the district court abused its discretion by deciding to give no weight to the benefits to Dow from its operation of the plant. The benefits to which the government points are reimbursement of expenses, management fees, and acquisition of knowledge and experience useful in subsequent endeavors, particularly Dow's post-war expansion into the plastics industry. Dow correctly points out that the evidence showed it shared its patents for amounts well below market rates, accepted a far below market management fee, and lost much of the benefit it might have realized when the government sold the plant to Shell Oil instead of Dow after the war. Reimbursement is, of course, no benefit at all, merely a squaring up. For example, it is not a benefit or additional compensation when the government reimburses the government's attorneys for their expense in traveling to court to argue this case.
 
 
 30
 The district court considered whether to weigh benefit to Dow as a factor and articulated a reasoned basis for disregarding it: "First, the evidence proffered by the United States to support this argument was in the main speculative, and, second, in the context of this case, the benefits to the United States clearly overwhelmed in magnitude those to Dow and the Rubber Companies." We could not substitute our judgment, even if it were different, because our review is limited to considering whether the district court abused its discretion, and in light of the reasons given, and the other reasons for the 100% allocation, it plainly did not.
 
 
 31
 C. The Findings.
 
 
 32
 The government argues that the district court clearly erred in finding the government control was as great as the findings of fact say. It characterizes its role as indirect, mostly involving setting production quotas and quality standards while letting Dow run the plant on a day to day basis, and it compares itself to a landlord whose tenant pollutes the leased property. We have carefully reviewed the record and cannot agree factually with that characterization. The government wanted Dow's management expertise as part of the deal, and it used it, but it retained full authority to control whatever it wished, and carefully and repeatedly reviewed how Dow disposed of the wastes with full authority to direct whatever different methods it might choose. In other matters, it did order Dow to deviate from the course of action Dow thought better, and Dow followed government orders. As for whatever details the government might not have known, that was only on account of its decision to use Dow's expertise and not spend government inspectors' and consultants' time finding out what Dow already knew. Dow's role was more nearly analogous to a soldier's than to a commercial tenant's.
 
 
 33
 We have carefully examined the record, and ascertained that the district court did not err in any of its factual findings regarding the government's knowledge and control.
 
 
 34
 D. The Indemnity Agreement.
 
 
 35
 Although the government had promised to hold Dow harmless, the government argues that its promise ought to have been disregarded by the district court in making the allocation. The hold harmless agreement said that Dow would in no event be liable for, but shall be held harmless by [the United States] against, any damage to or loss
 
 
 36
 or destruction of property ... or any injury to or death of persons, in any manner, arising out of or in connection with the work hereunder....
 
 
 37
 1. Jurisdiction.
 
 
 38
 The government's first argument is that the district court lacked jurisdiction to consider the indemnity agreement, because, under the Tucker Act, only the Court of Federal Claims can entertain contract claims for over $10,000 against the United States.[18] The government is correct that the district court lacked jurisdiction to enforce the contract against the United States.[19]
 
 
 39
 But that is immaterial. The district court didn't award relief on a contract claim. As the district court's findings and conclusions explain, the district court considered the contract in the course of performing its statutory duty, within its discretion, to decide what factors ought to be considered and to allocate costs according to those factors. Section 113(f) and 120(a) of CERCLA waive the United States's sovereign immunity and permit awards of financial liability against the United States based on "appropriate" "equitable factors."[20] The question is not whether the district court acted outside its jurisdiction by enforcing the indemnity agreement, because it didn't enforce the indemnity agreement. Rather, the question is whether the district court abused its discretion by considering the indemnity agreement as a factor bearing on the equitable allocation of costs. In Boeing, we noted that section 113 of CERCLA gives district courts "discretion to decide what [equitable] factors ought to be considered, as well as the duty to allocate costs according to those factors."[21] The district court did not abuse its discretion in deciding to consider this as a factor.
 
 
 40
 Had the government recovered a money judgment against Dow, Dow would have had to pay the judgment and then sue the government in the Claims Court. That did not occur. Instead the district court considered the inequity of allowing the government to impose part of the harm for the pollution when it had promised not to do so. The court was well within its discretion in considering that promise as a factor in equitable allocation. It is hard to see how it could be equitable to disregard it. The Tucker Act assigns contract cases against the government to the Claims Court but does not erect a rule of evidence that government contracts be excluded or disregarded in other courts. Since a district court may, under CERCLA, consider parties' contracts and indemnification agreements as factors affecting the equitable allocation of response costs,[22] we see no reason why contracts entered into by the government should not be considered.
 
 
 41
 2. Scope.
 
 
 42
 The government also argues that the indemnity agreement did not cover CERCLA costs, because, despite its broad language, the parties could not have contemplated that it would cover CERCLA costs, and the "damage to property" clause was not so broad as "any liability whatsoever" language would have been.
 
 
 43
 Because the district court did not grant judgment on a contract claim, we need not decide whether, had it done so, the contract would have embraced the damages for which it granted judgment. Obviously, the parties could not have contemplated, when they entered into the operating agreement, that decades later Congress would pass a law like CERCLA. Equally obviously, had CERCLA already been in effect, lawyers for such sophisticated corporations as those the government recruited for this war work would have recommended that their clients obtain language protecting them from CERCLA liability.
 
 
 44
 But none of this speculation matters, because the contract was considered as an equitable factor, and the sole basis for the judgment was allocation under section 113(f) of CERCLA. There was no recovery on the contract, so its precise scope is immaterial. The district court did not abuse its discretion by considering the contract as evidence of the parties' mutual intent that the work done on the government's property, with government materials, producing rubber that the government at all times owned, and waste that at all times the government owned, which was disposed of in ways the government approved, subject to the unlimited control of the government and regular review and supervision of the government, as an agent for the government, be done entirely at the government's expense and risk.
 
 
 45
 3. Ultra Vires.
 
 
 46
 The government's next argument is that the Rubber Reserve acted ultra vires, because under the Anti-Deficiency Act,[23] it lacked authority to commit the government to holding Dow harmless. That statute prohibits government officials from obligating the government "on any contract' for the payment of money before an appropriation is made unless[the contract is] authorized by law."[24] This argument is without force, because the agreement with Dow, including the hold harmless language, was authorized by law, namely the emergency powers Congress gave the President, and the regulations issued by the executive branch, for the prosecution of the war. The War Powers Act[25] authorized the President to authorize agencies to make contracts "without regard to the provisions of law" such as the Anti-Deficiency Act, "whenever he deem[ed] such action would facilitate the prosecution of the war."[26] The president exercised this authority in an executive order particularly directed to the Rubber Reserve.[27]
 
 
 47
 What's more, this is a red herring. Even if there were a serious question about whether the Rubber Reserve acted ultra vires in making the contract with Dow, it would make no difference, because in this case the contract was not enforced. It was merely considered as a factor in the equitable allocation of response costs.
 
 Conclusion
 
 48
 This is a shocking case. The government is trying to take money from firms it conscripted for a critical part of a great war effort. The government's arguments are strikingly weak. The pollution occurred almost six decades ago. The polluting conduct was completely under the direction of the government, it was legal at the time, and the government promised to hold the polluters, who acted as government agents, harmless. The government decided at the time that polluting the land and water this way was preferable to diverting resources from the war effort to do anything about it. Now the government wants its servants to pay for what it told them to do and promised them they could do with no fear of liability.
 
 
 49
 This is the third World War II case of which we are aware, in the Circuit Courts, in which the government has lost its claim against its servants in the war effort. The Third Circuit said in FMC Corp. v. U.S. Dep't of Commerce[28] that placing "a cost of war on the United States, and thus on society as a whole, [constitutes] a result which is neither untoward nor inconsistent with the policy underlying CERCLA."[29] In Shell, we said that "the cleanup costs are properly seen as part of the war effort for which the American public as a whole should pay."[30]
 
 
 50
 During oral argument we posed a hypothetical question to government counsel: Why wouldn't your argument require that the soldiers who fought the Japanese in the Aleutians be liable to pay part of the cleanup costs for the lead from their bullets that pollutes the ground on those islands? The government knew the question was coming, because the same hypothetical case was mentioned in the dissent in our 1998 decision.[31] The government's response was that, "as a theoretical matter, they could be liable" for the lead pollution, but that the district court would not be likely to allocate costs to them because of the equities. Indeed not. Yet the government challenges such an allocation here and, evidently, would leave the soldiers to prosecutorial discretion. Reliance on prosecutorial discretion seems like an undue risk to those aged Aleutian campaign veterans and their widows and estates. It would be obscene to hold a soldier who fought to regain American soil in the Battle of Attu liable for polluting the ground with his lead bullets. That they would be liable "as a theoretical matter" shows that the government's theory is mistaken.
 
 
 51
 We have no difficulty affirming the district court's exercise of discretion not to impose liability in the too-analogous circumstances of this case. We would only have difficulty in a case that went the other way.
 
 
 52
 The judgment of the district court is AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 David Pryce-Jones,Where there was no why, Spectator, Sept. 1998, at 452.
 
 
 [2]
 John Morton Blum,V Was for Victory 132 (1976). See generally Frank A. Howard, Buna Rubber — The Birth of an Industry (1947).
 
 
 [3]
 Brian Garfield,The Thousand Mile-War, 333-37 (1969); Claus M. Naske and Herman E. Slotnick, Alaska: A History of the 49th State, 129-30 (2d ed.1987).
 
 
 [4]
 Howard,supra note 2, at 213.
 
 
 [5]
 Id. at 216.
 
 
 [6]
 Id. at 215.
 
 
 [7]
 Id. at 221.
 
 
 [8]
 42 U.S.C. § 9601 et seq.;see also Mardan Corp. v. C.G.C. Music, Ltd., 804 F.2d 1454, 1455 (9th Cir.1986).
 
 
 [9]
 See 42 U.S.C. § 9613(f)(1)("Any person may seek contribution [of cleanup, or `response,' costs] from any other person [including the United States] who is liable or potentially liable under section [9607].").
 
 
 [10]
 See id.
 
 
 [11]
 Cadillac Fairview/Cal., Inc. v. Dow Chem. Co., 840 F.2d 691 (9th Cir.1988).
 
 
 [12]
 Cadillac Fairview/Cal., Inc. v. United States, 41 F.3d 562, 564 (9th Cir.1994) (per curiam) (quoting 42 U.S.C. § 9607(a)(3)).
 
 
 [13]
 Id. at 565-66.
 
 
 [14]
 42 U.S.C. § 9613(f)(1)
 
 
 [15]
 42 U.S.C. § 9613(f)(1) (2002)
 
 
 [16]
 Boeing Co. v. Cascade Corp., 207 F.3d 1177, 1187 (9th Cir.2000) (footnotes omitted).
 
 
 [17]
 294 F.3d 1045, 1048 (9th Cir.2002)
 
 
 [18]
 28 U.S.C. § 1346(a)(2) (2002)
 
 
 [19]
 Id.
 
 
 [20]
 42 U.S.C. § 9613(f)(1);see id. § 9620(a)(1).
 
 
 [21]
 Boeing, 207 F.3d at 1187.
 
 
 [22]
 Olin Corp. v. Yeargin Inc., 146 F.3d 398, 407 (6th Cir.1998); Dent v. Beazer Materials & Servs., Inc., 156 F.3d 523, 534 (4th Cir.1998); Kerr-McGee Chem. Corp. v. Lefton Iron & Metal Co., 14 F.3d 321, 326 (7th Cir.1994).
 
 
 [23]
 Presently codified, as amended, at 31 U.S.C. § 1341 (2002)
 
 
 [24]
 Id. § 1341(a)(1)(B); see Act of Mar. 3, 1905, ch. 1484, § 4 (1st par.), 33 Stat. 1214, 1257; Act of Feb. 27, 1906, ch. 510, § 3, 34 Stat. 27, 48.
 
 
 [25]
 First War Powers Act of 1941, ch. 593, 53 Stat. 838
 
 
 [26]
 Id. § 201, 55 Stat. at 839, repealed by Act of Sept. 6, 1966, Pub.L. No. 89-551, § 8(a), 80 Stat. 378, 651.
 
 
 [27]
 Exec. Order No. 9246, 7 Fed.Reg. 7379 (Sept. 17, 1942);see also Exec. Order No. 9001, 6 Fed.Reg. 6787 (Dec. 27, 1941).
 
 
 [28]
 29 F.3d 833 (3d Cir.1994)
 
 
 [29]
 Id. at 846.
 
 
 [30]
 294 F.3d at 1060
 
 
 [31]
 Cadillac Fairview, 41 F.3d at 567 (Kleinfeld, J., dissenting).