**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| TDY HOLDINGS, LLC; TDY INDUSTRIES, LLC, *Plaintiffs-Appellants*, <br><br> v. <br><br> UNITED STATES OF AMERICA; UNITED STATES DEPARTMENT OF DEFENSE; ASHTON B. CARTER, in his official capacity as Secretary of Defense, *Defendants-Appellees.* | No. 15-56483 <br><br> D.C. No. 3:07-cv-00787-CAB-BGS <br><br><br> ORDER AND AMENDED OPINION |

Appeal from the United States District Court
for the Southern District of California
Cathy Ann Bencivengo, District Judge, Presiding

Argued and Submitted May 8, 2017
Pasadena, California

Filed October 4, 2017
Amended March 20, 2018

Before: J. Clifford Wallace, Morgan Christen,
and Paul J. Watford, Circuit Judges.

Order;
Opinion by Judge Christen;
Concurrence by Judge Watford

# SUMMARY[*]

## CERCLA

The panel reversed the district court's judgment in favor of the United States in an action brought by a plaintiff military contractor under the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), seeking contribution from the government for its equitable share of the cleanup costs of plaintiff's aeronautical manufacturing plant located in San Diego, California.

CERCLA imposes strict liability on potentially responsible parties ("PRP") for the cleanup costs of an environmental hazard. Plaintiff and the federal government were PRPs for the cleanup at issue, and plaintiff argued that the district court abused its discretion when it allocated all of the cleanup costs to plaintiff.

The panel rejected plaintiff's suggestion that the district court erred by misconstruing the concept of "fault," or misunderstanding CERCLA's strict liability statutory scheme. The panel further held the district court did err, however, in its analysis and application of the two most on-point decisions – *United States v. Shell Oil Co.*, 294 F.3d 1045 (9th Cir. 2002), and *Cadillac Fairview/California, Inc. v. Dow Chem. Co.*, 299 F.3d 1019 (9th Cir. 2002) – that considered how CERCLA cleanup costs should be allocated between military contractors and the federal government. The panel held that the district court erred in concluding that

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

*Shell Oil* and *Cadillac Fairview* were not comparable, and in allocating zero percent of clean-up costs to the government, particularly in light of the parties' prior course of dealings and the government's requirement that plaintiff use two of the hazardous chemicals at issue. The panel remanded for additional proceedings.

Judge Watford concurred. He agreed that the record did not support allocating 100% of the clean-up costs to plaintiff, but in his view the record did support something close to that.

---

**COUNSEL**

Randall M. Levine (argued), Douglas A. Hastings, David B. Salmons, and Bryan M. Killian, Morgan Lewis & Bockius LLP, Washington, D.C.; James J. Dragna, Morgan Lewis Bockius LLP, Los Angeles, California; for Plaintiffs-Appellants.

Rachel E. Heron (argued), Dustin J. Maghamfar, Mark A. Rigau, Lewis M. Barr, Ellen J. Durkee, Aaron P. Avila, and Jennifer Scheller Neumann, Attorneys; Eric Grant, Deputy Assistant Attorney General; Jeffrey H. Wood, Acting Assistant Attorney General; Environment and Natural Resources Division, United States Department of Justice, Washington, D.C., for Defendants-Appellees.

Eric B. Wolff, Alexander M. Fenner, and Mark W. Schneider, Perkins Coie LLP, Seattle, Washington; Shane R. Swindle, Perkins Coie LLP, Phoenix, Arizona; for Amicus Curiae National Defense Industrial Association.

---

**ORDER**

The opinion filed on October 4, 2017, and appearing at 872 F.3d 1004, is amended as follows.  On page 13 of the slip opinion:

> Replace the sentence reading <In contracts from the 1970s to 1999, the government paid between 90 and 100 percent of the CERCLA cleanup costs that arose from TDY's San Diego Plant.> with <In contracts from the 1970s to 1999, the government paid between 90 and 100 percent of the environmental cleanup costs that arose from TDY's San Diego Plant.>

> Replace the sentence reading <But the cleanup expenses largely paid by the government prior to 1999 cannot be fairly described as ongoing contract overhead, nor as costs incurred in implementing preventive measures to comply with heightened environmental standards.> with <But the cleanup expenses largely paid by the government prior to 1999 cannot be fairly analogized to costs incurred in implementing measures to comply with heightened environmental standards.>

> Replace the sentence reading <The parties' prior course of dealings concerning CERCLA cleanup costs from the same site constitutes a relevant factor in the allocation analysis.> with <The parties' prior course of dealings

concerning cleanup costs from the same site constitutes a relevant factor in the allocation analysis.>

An amended opinion is filed concurrently with this order.

With this amendment, the panel has unanimously voted to deny Appellees' petition for panel rehearing filed on January 19, 2018.

The petition for panel rehearing is **DENIED**. No further petitions for en banc or panel rehearing shall be permitted.

## OPINION

CHRISTEN, Circuit Judge:

Plaintiffs-Appellants TDY Holdings, LLC, TDY Industries, LLC, and its predecessor, the Ryan Aeronautical Company (collectively, TDY), operated a forty-four-acre aeronautical manufacturing plant located in San Diego, California, from 1939 to 1999. TDY derived between 90 and 99 percent of its business from military contracts with the U.S. government. Over time, certain chemical substances used in the course of manufacturing operations were released, contaminating the soil and groundwater in and around the plant and requiring TDY to incur substantial remediation expenses. In 2007, TDY filed a complaint under the Comprehensive Environmental Response Compensation and Liability Act (CERCLA), seeking contribution from the government for its equitable share of the cleanup costs. After a twelve-day bench trial, the district court granted judgment

in favor of the United States, allocating 100 percent of past and future CERCLA costs to TDY and zero percent to the government. TDY appeals from the district court's judgment.

We have jurisdiction under 28 U.S.C. § 1291. Because we conclude the facts of this case do not justify the district court's sharp deviation from our previous case law, we reverse and remand.

## I.  BACKGROUND

### A.  Factual History

The Ryan Aeronautical Company, later known as TDY, opened a manufacturing plant near the San Diego Airport in 1939.  During World War II, it manufactured aircraft and aircraft parts for the war effort.  More recently, it manufactured aeronautical products including drones, Apache helicopter components, and avionics systems for the U.S. military.  The site closed in 1999 after Northrop Grumman purchased TDY's Ryan assets and moved the site's operations elsewhere.

During the sixty years in which TDY operated the manufacturing plant, the United States was TDY's primary customer; 99 percent of the work conducted at the site between 1942 and 1945, and 90 percent of the work in the following years, was done under contract with the U.S. military.  From 1939 to 1979, the United States also owned some of the equipment at the site pursuant to government programs intended to finance and oversee the construction and outfitting of government-owned industrial facilities leased to private companies.  This equipment included

drilling machines, an electrical substation, vapor degreasers, and transformers.

Three hazardous substances were released during the course of manufacturing operations, contaminating the soil and the groundwater in and around the site. These substances were: (1) chromium compounds used to impart corrosion resistance on aluminum aircraft parts; (2) chlorinated solvents used to degrease parts and tools; and (3) polychlorinated biphenyls (PCBs) used to provide plasticity and durability to certain materials. In some cases, military specifications in the government's contracts with TDY required the use of chromium compounds and chlorinated solvents to ensure a proper quality product. Following the passage of the Clean Water Act and other environmental laws in the 1970s, these substances were listed as "hazardous substances" requiring remediation under CERCLA. Between the early 1970s and 1999, TDY billed the government for the "indirect costs" of environmental remediation and compliance with federal and state environmental laws, including costs incurred cleaning up storm drains at the plant and PCB contamination of nearby Convair Lagoon. The government paid these costs. After more stringent standards were instituted, the California Regional Water Quality Control Board issued a new cleanup order requiring TDY to assess and remediate waste discharges at the site. To comply with the order and other state directives issued after operations at the plant ceased in 1999, TDY incurred over $11 million in response costs.

## B. Procedural History

The San Diego Unified Port District brought CERCLA claims against TDY in June 2004. The United States was not a party to that litigation. In March 2007, TDY and the Port

District entered into a settlement agreement providing, in part, that TDY would respond to the release of hazardous substances at the site. On April 30, 2007, TDY filed a complaint against the United States, the United States Department of Defense, and the Secretary of Defense, seeking contribution under 42 U.S.C. § 9613(f)(1) from the government for past and future response costs incurred by TDY in remediating hazardous waste released from the site. The complaint also sought declaratory relief establishing that the government was wholly liable for remediation costs. The government counterclaimed for contribution from TDY. TDY filed a motion for partial summary judgment seeking a declaration that the United States was liable as a "past owner" of facilities, one of four categories of potentially responsible parties (PRPs) under CERCLA. The district court granted TDY's motion on July 15, 2011. TDY stipulated to its own liability as a PRP, and the case was transferred and set for trial on TDY's allocation claim.

The district court held a twelve-day bench trial on equitable allocation in April 2012. It heard testimony from twenty-seven witnesses and admitted over 1800 exhibits. The district court held that: (1) TDY was liable as an owner of facilities and the operator of the site because it managed, directed, and conducted operations resulting in the release or disposal of hazardous waste, and implemented decisions regarding compliance with environmental regulations; and (2) the introduction of the three contaminants at issue was attributable not to the government but instead to TDY's storage, maintenance, and repair practices, as well as spills and drips that occurred in the manufacturing process.

After reviewing the totality of the circumstances, including the "Gore Factors" that courts sometimes refer to

when considering equitable allocation of costs,[1] the district court concluded that the most important factors for equitable allocation in this case were "the contribution and involvement of each party in the discharge, release or disposal of hazardous material and . . . the care exercised by the parties with respect to the materials concerned." The court "consider[ed] the respective roles of the parties as defined by CERCLA, and then how[,] in the context of these roles[,] each party contributed to the contamination." The court concluded that, "[g]iven the nature of the contamination, . . . TDY's role as the Site operator, responsible for the handling, storage and disposal of the contaminants at issue in this case, is the most relevant factor in allocating costs." The district court allocated 100 percent of past and future response costs for the remediation of chromium, chlorinated solvents, and PCBs to TDY.

---

[1] The Gore Factors are: "(1) the ability of the parties to demonstrate that their contribution to a discharge, release or disposal of a hazardous waste can be distinguished; (2) the amount of the hazardous waste involved; (3) the degree of toxicity of the hazardous waste involved; (4) the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste; (5) the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and (6) the degree of cooperation by the parties with Federal, State, or local officials to prevent any harm to the public health or the environment." *Kerr-McGee Chem. Corp. v. Lefton Iron & Metal Co.*, 14 F.3d 321, 326 n.4 (7th Cir. 1994).

## II.  DISCUSSION

### A.  Standard of Review

We review for an abuse of discretion the equitable factors that a district court considers in allocating CERCLA costs and review for clear error the allocation according to the selected factors.  *Boeing Co. v. Cascade Corp.*, 207 F.3d 1177, 1187–88 (9th Cir. 2000); *see Cadillac Fairview/California, Inc. v. Dow Chem. Co.*, 299 F.3d 1019, 1025 (9th Cir. 2002) ("Under section 113 of CERCLA, the district court 'may allocate response costs among liable parties using such equitable factors as the court determines are appropriate.'" (quoting 42 U.S.C. § 9613(f)(1))); *see also NCR Corp. v. George A. Whiting Paper Co.*, 768 F.3d 682, 702 (7th Cir. 2014) ("[T]he district court must decide what is relevant based on the record as a whole; an allocation based on otherwise permissible factors will not be rescued if it does not explain why the court has chosen to disregard other apparently relevant information.").

### B.  CERCLA Cost Allocation Claim

"Congress enacted CERCLA in 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986 (SARA), Pub. L. No. 99-499, 100 Stat. 1613, 'in response to the serious environmental and health risks posed by industrial pollution.'"  *Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.*, 710 F.3d 946, 956 (9th Cir. 2013) (quoting *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009)). CERCLA "imposes strict liability on four categories of potentially responsible parties (PRPs), for the cleanup costs of an environmental hazard, even if the person did not contribute to the contamination."  *Id.* at 956–57 (footnote

omitted). The four categories of PRPs are: (1) a past owner or operator of a facility; (2) an owner or operator of a facility; (3) an arranger of waste disposal; or (4) an entity that accepts waste for treatment or disposal. *United States v. Shell Oil Co.*, 294 F.3d 1045, 1053 (9th Cir. 2002); *see* 42 U.S.C. § 9607(a). Once a PRP is found liable, it may sue other PRPs for contribution to remediation costs under 42 U.S.C. § 9613(f). Earlier proceedings established that both TDY and the government are PRPs, and those determinations are not on appeal. Instead, TDY argues that the district court abused its discretion when it allocated all of the cleanup costs to TDY. TDY's principal arguments are that: (1) the district court failed to appreciate that CERCLA is a strict liability statute and instead allocated liability according to relative "fault"; (2) the government's role as an "owner" rather than an "operator" should not have been a dispositive factor in the court's cost allocation; and (3) the government should bear a greater share of response costs because it specifically required that TDY use the hazardous substances that necessitated remediation before the hazardous nature of the substances was known.

At the outset, we reject TDY's suggestion that the district court erred by misconstruing the concept of "fault," or misunderstanding CERCLA's strict liability statutory scheme. The district court's use of the word "fault" was in the context of its application of the Gore Factors, specifically factors (3) and (5), which respectively concern the degree of the parties' involvement in the generation or disposal of hazardous waste and the degree of care that the parties took with respect to the waste. The district court's consideration of these factors was appropriate, particularly in light of its finding, supported by the record, of the evolving awareness of the hazardous nature of the chemicals at issue, and TDY's adaptation to more

stringent environmental standards over time. Nor did the district court abuse its discretion by considering the significance of the government's role as "owner" rather than "operator" in its analysis of the Gore Factors. The court expressly recognized that an earlier proceeding established the government's liability under CERCLA as an owner of equipment at the site, *see TDY Holdings, LLC v. United States*, 122 F. Supp. 3d 998, 1015 (S.D. Cal. 2015), but held the government's total absence from the site during the last twenty years of its operation relevant to the parties' differential contribution to the release of hazardous waste under the first Gore Factor. We hold there was no error in this.

The district court did err, however, in its analysis and application of the two most on-point decisions from our court: *Shell Oil* and *Cadillac Fairview*. The government characterizes these cases as "outliers," but they are binding circuit authority. Both cases considered how CERCLA cleanup costs should be allocated between military contractors and the U.S. government. Shell Oil Co. and Dow Chemical Co. incurred liability while producing products essential to the military's efforts in World War II. *See Shell Oil Co.*, 294 F.3d at 1049; *Cadillac Fairview*, 299 F.3d at 1022. TDY also served the military during World War II and in subsequent conflicts. Like Shell Oil Co. and Dow Chemical Co., TDY's work involved the use or generation of hazardous substances known by the government—at least by the 1970s—to be environmental contaminants. *See Shell Oil Co.*, 294 F.3d at 1051; *Cadillac Fairview*, 299 F.3d at 1022–23; *see also* 1972 Clean Water Act, 33 U.S.C. §§ 1251–1387; 1976 Toxic Substances Control Act, 15 U.S.C. §§ 2601–2692. Significantly, in all three cases the government either required the use of the hazardous

substances to ensure the final product met quality standards, or mandated that production proceed in a certain manner to increase output, resulting in the generation of hazardous waste. *See Shell Oil Co.*, 294 F.3d at 1050; *Cadillac Fairview*, 299 F.3d at 1022–23. In *Shell Oil* and *Cadillac Fairview*, we affirmed district court judgments allocating 100 percent of cleanup costs to the government and emphasized that the contractors' costs were "properly seen as part of the war effort for which the American public as a whole should pay." *Shell Oil*, 294 F.3d at 1060; *see also Cadillac Fairview*, 299 F.3d at 1029.

Despite the similarities between this case, *Shell Oil*, and *Cadillac Fairview*, the district court concluded that *Shell Oil* and *Cadillac Fairview* were not comparable and allocated zero percent of clean-up costs to the government. We agree that some deviation from the allocation affirmed in *Shell Oil* and *Cadillac Fairview* was warranted by distinguishing facts. First, as the district court recognized, the government exerted more control over day-to-day operations in *Shell Oil* and *Cadillac Fairview* than it did here, and in *Cadillac Fairview* the government contractually agreed to indemnify its contractor for its cleanup costs. 299 F.3d at 1026. The district court's findings that the government was not an "operator" of TDY's site in San Diego; that government-owned equipment had been removed or sold to TDY twenty years before TDY ceased operations at the site; and that TDY's own repair and maintenance practices caused the contamination, justify the district court's ruling that TDY should bear some of the cleanup costs. Nor did the district court err by determining that industrial operations undertaken for the purpose of national defense, standing alone, did not justify allocating all costs to the government.

Nevertheless, encumbering a military contractor with 100 percent of CERCLA cleanup costs that were largely incurred during war-effort production was a 180 degree departure from our prior case law, and the out-of-circuit authority that the district court relied upon does not warrant such a sharp deviation. This is particularly true because, as TDY correctly argues, the government's contracts with TDY required the use of two of the three chemicals at issue beginning in the 1940s, when the hazardous nature of the substances and the need to take precautionary steps to minimize their release were unknown. The district court found that TDY complied with prevailing environmental standards at that time, and responded to new regulations in the 1970s by modifying its operational practices to reduce environmental contamination. The court's acknowledgment of the evolving understanding of environmental contamination caused by these chemicals, and TDY's prompt adoption of practices to reduce the release of hazardous chemicals into the environment once the hazards became known, further undercuts the decision to allocate 100 percent of the costs to TDY.

In addition, the district court did not consider adequately the parties' lengthy course of dealings in which the government repeatedly agreed to share in TDY's environmental cleanup costs from this site. In contracts from the 1970s to 1999, the government paid between 90 and 100 percent of the environmental cleanup costs that arose from TDY's San Diego Plant. Despite this history, the district court reasoned that a shift away from our prior case law was warranted because "[m]any industries incur expenses as a result of environmental compliance obligations and pass those costs on to their customers. . . . [but a] consumer who pays a business's recycling fee as part of the invoice for his

car's oil change is not acknowledging responsibility for remediation expenses if that company discharges oil or other pollutants into the environment." We agree with the district court that a customer's willingness to pay disposal costs incorporated as cost overhead cannot be equated with a willingness to foot the bill for a company's unlawful discharge of oil or other pollutants. But the cleanup expenses largely paid by the government prior to 1999 cannot be fairly analogized to costs incurred in implementing measures to comply with heightened environmental standards. Indeed, TDY may have continued to enter into contracts with the government in reliance on its expectation, based on its decades-long course of dealings with the government, that its CERCLA cleanup costs would be reimbursed, or at least shared. The parties' prior course of dealings concerning cleanup costs from the same site constitutes a relevant factor in the allocation analysis. *See NCR Corp. v. George A. Whiting Paper Co.*, 768 F.3d 682, 702 (7th Cir. 2014).

We are mindful that this appeal comes to us under an abuse of discretion standard, and that the district court has broad discretion in allocating costs among PRPs. *See Boeing Co.*, 207 F.3d at 1187. We further acknowledge that important distinctions exist between the present case and *Shell Oil* and *Cadillac Fairview*, where the government exercised more control over production than it did here. *See, e.g.*, 299 F.3d at 1026 (finding that the government exercised "unfettered control" over the contracting company's operations). But the analogy relied upon by the district court cannot bear the weight of such an extreme departure from our prior case law, particularly in light of the parties' prior course of dealings and the government's requirement that TDY use two of the hazardous chemicals at issue. Accordingly, we

reverse the district court's judgment and remand for additional proceedings consistent with this decision.

**REVERSED and REMANDED**

WATFORD, Circuit Judge, concurring:

I agree with my colleagues that the record does not support allocating 100% of the clean-up costs to TDY. In my view, though, the record does support something close to that.

The district court found that TDY was solely responsible for the acts that led to the environmental contamination at issue here. Those acts consisted primarily of TDY's employees' failure to clean up drips and spills of chromium, chlorinated solvents, and PCBs, along with the employees' careless storage and disposal practices, all of which allowed the chemicals to seep into the soil and groundwater beneath the plant. The district court found that these aspects of the plant's day-to-day operations were solely under TDY's control; they were not controlled or directed by the government.

TDY doesn't challenge these factual findings on appeal. Its sole contention is that, despite these findings, the government should still bear all or most of the liability for cleaning up the site because the contamination occurred while TDY was performing government defense contracts. TDY is right that the government must be required to foot at least a portion of the bill. But I agree with TDY on that score only because, as the court notes, the government *required* TDY to use two of the three chemicals (chromium and chlorinated

solvents) at a time when neither TDY nor the government had any reason to know that these chemicals were hazardous. Of course, because the government did not know of the hazards posed by the chemicals, it can't be faulted for failing to warn TDY. But equity demands that the government bear at least some responsibility for having required an unsuspecting contractor to use chromium and chlorinated solvents in the first place. As far as the record discloses, those are chemicals TDY might have chosen not to use if left to its own devices. (I see no reason to disturb the district court's allocation of clean-up costs with respect to contamination caused by PCBs, since the government did not require TDY to use PCBs.)

That the government must, as a matter of equity, be allocated some share of the clean-up costs does not mean that its share must be substantial. TDY suggested at oral argument that the district court would abuse its discretion on remand if it failed to allocate at least 50% of the clean-up costs to the government. I don't think that's right, given the district court's unchallenged factual findings. The court found that the government was innocent in requiring use of chromium and chlorinated solvents, and that the actions of TDY's employees caused the contamination as part of plant operations solely under TDY's control. In light of those findings, the court remains free on remand to allocate the lion's share of liability to TDY. It just has to allocate some portion of the clean-up costs to the government to reflect the government's role in mandating the use of chromium and chlorinated solvents. As long as the court does that, it retains the discretion, within a fairly wide band, to arrive at an equitable cost allocation.