TDY HOLDINGS, LLC et al., Plaintiff,

v.

UNITED STATES of America
et al., Defendants.

Case No. 3:07–CV–787–CAB–BGS.

United States District Court,
S.D. California.

Signed July 29, 2015.

Bradley Wine, Michael Coyn Mateer, Tina D. Reynolds, Morrison & Foerster, L.L.P., McLean, VA, Pablo Aristophanes Nichols, Morrison & Foerster, L.L.P., San Francisco, CA, for Plaintiff.

U.S. Attorney CV, U.S. Attorneys Office Southern District of California, San Diego, CA, Lewis M. Barr, Dustin J. Maghamfar, Kim Smaczniak, Michelle R. Lambert, US Department of Justice, Washington, DC, Mark A. Rigau, US Department of Justice, San Francisco, CA, Robert H. Foster, US Department of Justice, Denver, CO, for Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CATHY ANN BENCIVENGO, District Judge.

### I. Introduction

Plaintiffs TDY Holdings, LLC and TDY Industries, LLC (collectively "TDY") filed

a complaint against defendants the United States of America, the United States Department of Defense, and the Secretary of Defense (collectively "the Government") seeking an equitable allocation of the response costs TDY has incurred, and will incur, for the cleanup of a 44–plus acre manufacturing site in San Diego (the "Site"). The Site, located at 2701 North Harbor Drive, San Diego, California, is bordered on the north by the San Diego International Airport at Lindbergh Field and on the south by the Convair Lagoon, which is part of an inlet of the Pacific Ocean. TDY, or its predecessors, had leased the Site from the City of San Diego and later the San Diego Unified Port District.

For decades Ryan Aeronautical Company ("Ryan") manufactured aircraft and aircraft parts at the Site. The majority of this manufacturing was to fulfill military contracts for the Government. In 1969, Teledyne Industries, Inc., purchased Ryan and the entity became known as Teledyne Ryan Aeronautical. Teledyne Industries later became known as TDY, and in 1999, TDY divested its Ryan assets to Northrop Grumman. After 60 years of operation, manufacturing ceased on the Site in 1999. The buildings were eventually demolished and removed.

Following closure of TDY's manufacturing operations, the California EPA Regional Water Quality Control Board ("RWQCB") ordered a Site-wide investigation of soil, soil gas, and ground water to identify areas requiring remediation. During the decades of manufacturing operations, the Site became contaminated with three hazardous substances that are at issue in this litigation: chromium compounds, chlorinated solvents, and polychlorinated biphenyls ("PCBs").

The Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), as amended by the Super-

fund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601–9675, requires statutorily defined potentially responsible parties ("PRPs") to pay their equitable share of costs associated with the cleanup of a contaminated site. TDY has acknowledged its responsibility for the costs incurred to investigate and remediate the Site (see 42 U.S.C. § 9607(a)) and has paid substantial expenses to do so. TDY now seeks contribution from the Government, as an "owner of facilities" at the Site, pursuant to 42 U.S.C. § 9613(f), for the Government's equitable share of those expenses.

The Government counterclaimed pursuant to 42 U.S.C. § 9613(f)(1), and requests that TDY's claim for relief be denied in its entirety or alternatively, that any equitable apportionment appropriately reflect TDY's liability.

## II. Jurisdiction

The district court has subject matter jurisdiction over all claims arising under CERCLA. See 42 U.S.C. § 9613(b); 28 U.S.C. § 1331. This Court has authority to grant declaratory relief pursuant to 42 U.S.C. § 9613(g)(2) and 28 U.S.C. § 2201. Venue is proper in this court because the Site is located in the Southern District of California. 28 U.S.C. § 1391(e). The Government has expressly waived sovereign immunity to CERCLA claims for contribution and/or cost recovery. 42 U.S.C. § 9620(a)(1).

## III. Proceedings

The complaint in this case was filed on April 30, 2007 and an amended complaint was filed on November 18, 2008. [Doc. Nos. 1, 61.] TDY filed a motion for partial summary judgment seeking a declaration that the Government was a "past owner" PRP as defined by CERCLA, 42 U.S.C. § 9607(a)(2), and therefore responsible for

response costs incurred by TDY. [Doc. No. 73.] On July 15, 2011, United States District Judge John Houston granted TDY's motion. [Doc. No. 169.] TDY stipulated to its own liability under CERCLA. [Doc. No. 170.] The matter was subsequently transferred to the undersigned for a trial to allocate response costs between the parties, using such equitable factors as the Court determines are appropriate. 42 U.S.C. § 9613(f)(1).

The Court held a 12–day bench trial on the equitable allocation claim during which 27 witnesses testified (8 by deposition designation), and over 1,800 exhibits were admitted into evidence. Post-trial, TDY and the Government each submitted voluminous briefing and Proposed Findings of Fact and Conclusions of Law. Based upon the testimony and exhibits received into evidence at trial, and after full consideration of the legal arguments of the parties, the Court issues the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a).[1]

## IV. Findings of Fact and Conclusions of Law[2]

### A. Historical Background

TDY operated an aeronautical manufacturing plant on the Site for more than sixty years, between 1939 and 1999. Before World War II ("WWII"), Ryan voluntarily solicited defense business to provide airplanes, aircraft parts and structural assemblies for aircraft to the military in response to the anticipated need for such war materials. During WWII, Ryan was a prime and subcontractor to the Government for aircraft and aircraft parts. After the end of WWII and continuing through the Korean War, the Vietnam War, the Cold War, and until the end of the 20th century, Ryan (and its TDY successors) continued soliciting contracts from the Government, and to a much lesser extent for private entities, and manufacturing aircraft and aircraft parts at the Site to fulfill these contracts.

During the sixty years of operations at the Site, TDY[3] produced a variety of aeronautical products including unmanned aerial vehicles, trainer airplanes, aerial targets, components and assemblies for the Apache helicopter, fuselages, experimental aircraft such as the first hybrid jet and propeller plane, sophisticated avionics systems, and airplane engine exhaust manifolds. TDY made a significant and lasting contribution to this country's aeronautical defense program that benefitted both the Government and the company. The decades of history recounted by TDY's witnesses told a story of engineering innovation and pride in the work TDY performed and the products the company produced.

These products manufactured for the Government at the site are not in themselves the contaminants of concern in this litigation, nor do they contain the contaminants. Rather the three hazardous substances that are the subject of the remediation—chromium compounds, chlorinated solvents and PCBs, were used in some of

---

1. Any portions of this opinion expressed as factual findings that should be considered conclusions of law are so designated. Likewise, any legal conclusions that should be considered factual findings are so designated.

2. As is common in these cases, the quality of evidence, particularly direct evidence, has diminished by the passage of time and there is a lack of business records reflecting the day-to-day operations of the site. Consequently the Court's findings in this case are based largely on circumstantial evidence and inferences that can reasonably be drawn from the available evidence. *See Niagara Mohawk Power Corp. v. Chevron USA, Inc.,* 596 F.3d 112, 131 (2d Cir.2010).

3. Going forward, references to TDY are intended to include its predecessor Ryan, unless otherwise specified.

the manufacturing processes and/or were present in some equipment used in the manufacture of the aeronautical products.

### B. Evolving Industry Standards.

The picture that developed at trial through the reconstructed history of the TDY's operations at the Site was one of a manufacturing site where chemical contaminants were generally handled in accordance with the practices and procedures of the times. During its six decades of operation, environmental awareness and concern regarding contamination evolved and TDY adapted its practices and procedures in the management of these contaminants to meet the requirements and regulations that developed over time.

The testimony did not demonstrate significant willful disregard of environmental regulation or any singular catastrophic event that resulted in the contamination of the ground or water in the area. Rather it was the regular day-to-day operation of the plant, in accordance with the standards of the times, which resulted in the gradual accumulation of contaminants in the ground, sediment and water that necessitated the site remediation. Some of these practices with the benefit of hindsight were careless and improper. For the most part, however, there was little evidence that TDY personnel acted with knowing disregard for environmental safety and regulation.

It is undisputed that the Government (1) benefitted from TDY's manufacturing at the Site, (2) owned some of the equipment related to the contamination, and (3) observed and knew of TDY's production processes and maintenance practices that released contaminates into the environment. However, to determine the extent to which responses costs should be allocated to the Government, it is necessary to review the nature and source of each contaminant.

### C. Contaminates of Concern

#### 1. Chromium Compounds

TDY used chromium-containing substances in a variety of chemical treatment processes at the Site. Specifically, TDY used hexavalent chromium, a hazardous substance, extensively to impart corrosion resistance to the surfaces of aluminum and aluminum alloy aircraft parts.[4] These treatments included chromium plating (also known as electroplating), chromic acid anodizing, chromium alodining, and chromium deoxidation. The chromium processing lines were located originally in Building 120 and then primarily in Building 158.[5]

Chromium processing usually involved dipping the aircraft parts into a series of tanks, at particular intervals and in particular sequences. As parts were moved from one tank of liquid to another, some of the chromium-containing compounds would be "dragged out" along with the

4. Hexavalent chromium was also a component in paint primers used to coat metal aircraft parts and as a water treatment chemical used as an algaecide and for corrosion control in the recirculating water cooling towers. Any chromium contamination at the Site that could be attributed specifically to these uses, however, was below clean up goals and did not require remediation.

5. Built during WWII, Building 120 was one of the oldest and largest buildings (approximately 180,000 square feet, with a 20 foot ceiling)

on the Site and served as the main manufacturing building for the entire period of operations. Located in the center of the Site, Building 120 housed many of the processing lines that used the chemical contaminants now subject to remediation. Building 158 was the major location of the aluminum and aluminum alloy metal surface treatment operations using chromium after the mid–1950s. Located to the west of Building 120, this much smaller building was the focus of the chromium contamination remediation efforts.

part and would drip onto the surrounding floor. The concrete floor in Building 158 in the area of the chromic acid plating line had green and yellow stains attributed to the drag out from the operation of the line, and to the replenishing of the tanks with chromium containing solutions. Additionally, some of the tanks of chromium-containing liquid were aerated to mix the liquids. This agitation caused micro-quantities of chromic acid to be released into the air which settled on nearby surfaces. In the later years, as environmental awareness and concerns increased, TDY instituted steps to minimize operational releases of this hazardous chemical, but for years the release of some chromium into the environment was apparently accepted as a normal condition of the processing operation.

During the demolition of the former manufacturing buildings in 2011, concentrations of hexavalent chromium requiring remediation were found in the soil beneath the concrete slabs of Buildings 120 and 158. In the area of Building 158, the ground water was contaminated with chromium as well. These areas of chromium contamination corresponded with the locations of the chromium process lines.

Chromium does not degrade over time. The level of contamination reflected the cumulative release of hexavalent chromium into the environment over the decades of operation at the Site. The concentrations that required remediation however were relatively discrete and localized. TDY's remediation expert Sam Williams considered it relatively minor compared to other aerospace manufacturing sites and consistent with the normal operation of the processing line. It did not evidence any dumping or catastrophic release.

The remediation included excavating and transporting the contaminated soil off-site for disposal. The groundwater contamination, meanwhile, was treated "in situ," first with injections of ferrous sulfate, and then emulsified vegetable oil, to reduce it to trivalent chromium, a non-hazardous compound. By the time of trial, the site remediation goals for chromium were reportedly achieved with these treatments.

## 2. Chlorinated Solvents

Chlorinated solvents, or volatile organic compounds ("VOCs"), are cleaning compounds that were used to degrease parts and tools at the site. TDY used different types of chlorinated solvents over the decades at the Site. Trichloroethene, also referred to as TCE, was used from the 1940s until the early 1970s, when its use became regulated by the Clean Air Act. In response to air pollution control requirements to reduce emissions, in the 1970s TDY switched to perchloroethene, referred to as PCE or PERC, as a solvent. Then in the early 1980s, TDY switched to tetrachloroethene, referred to as TCA, as its primary solvent.

During the manufacturing and assembly process, TDY cleaned machined parts and tools with these solvents to remove dirt and lubricant coatings left from the machining operations. This degreasing process was sometimes done by hand dipping parts into small containers of solvent or wiping them clean with rags soaked with solvent.

TDY cleaned larger parts using vapor degreasers. There were up to five vapor degreaser tanks operating at various times and in various locations at the Site. Vapor degreasers ranged from relatively small tanks, 2 feet by 2 feet, up to TDY's principle degreaser tank in Building 120 that was 15 feet long by 6 feet wide and around 8 feet deep. This large degreaser tank was filled with 200 to 300 gallons of chlorinated solvent. The degreasers in Building 120 were in or near a maintenance pit,

which was about 30 feet long by 18 feet wide by 5 feet deep with a concrete floor.

The cleaning process using the vapor degreasers involved heating the solvent in a degreaser tank to a boil. The resulting vapor would fill much of the tank. Dirty parts were lowered into the vapor. The vapor condensed on the parts and removed the dirt and grease. The principle degreaser also had spray wands which could be used by the operator to spray liquid solvent onto the parts within the tank. Once the dirt and grease was removed, the parts would be raised out of the tank.

When parts were removed from the degreasing tank into the surrounding area, solvent was dragged out and dripped to the building floor and the floor of the maintenance pit. Occasionally, errant spray from the wands would escape the tank to the surrounding area. TDY Maintenance Group was responsible for spent solvent removal and recharging the vapor degreasing tanks. No evidence was presented of a major spill or large release of solvent into the environment. The evidence of Site contamination reflects that, in addition to operational releases, occasional minor releases occurred in the ordinary maintenance of the tanks, during the removal of spent solvent and the refill of the tanks, and related to the storage of the fresh and spent solvents on Site.

Prior to the mid–1970s, there were no significant restrictions on the discharge of these solvents. TDY had a permit, in accordance with municipal industrial waste ordinances, to dispose of chlorinated solvents into a sanitary sewer drain in the area of Building 131. This practice of disposing of solvents in the sewer was consistent with industry standards and municipal codes at the time.

In the 1970s, all these chlorinated solvents became regulated pollutants under the Clean Water Act, at which time TDY no longer disposed of them into the sani-

tary sewer. Instead, TDY collected the spent solvents in a 5,200–gallon storage tank near Building 166. TDY's Material Control Group engaged solvent recyclers who bought the spent solvent from TDY and sold TDY recycled solvent. In response to environmental regulation, TDY also implemented instructions for the rotation of parts before removal from the degreasing tanks to eliminate virtually all of the solvent drag-out from the degreasers.

Chlorinated solvent contamination requiring remediation was identified both in the soil and soil vapor (pore space between grains) and in the groundwater at the Site. The contaminated soil was located in three areas: (1) the western portion of the site under Building 131; (2) under Building 120; and (3) west of Building 166. Sources of the soil contamination corresponded with work stations, processing lines and storage facilities. These areas were discrete and reflected operational and small releases in maintenance and storage areas. Building 131 housed a drum and hand degreasing station in the area of the soil contamination. The soil contamination beneath Building 120 corresponded with operation of the vapor degreasers and the location of the maintenance access pit. Building 166 was the location of the solvent storage tank. The amount of soil contamination was inconsistent with a major spill or dumping. It was consistent with contamination observed at manufacturing sites of this character.

The contaminated soil in these locations was excavated and transported off-site for disposal. By the time of trial, the remediation goals for the chlorinated solvent soil contamination were achieved.

Chlorinated solvent contamination of ground water was more widespread but also attributable to operations, disposal and storage practices. The contaminated groundwater was located in four areas.

First, a large plume was identified in the vicinity of the sanitary sewer line by Buildings 131 and 242, where TDY discharged solvents by permit until the mid–1970s. The sewer pipe line was comprised of vitrified clay and when it was removed during the site demolition process, it showed evidence of cracks and breaks that permitted the discharged solvents to migrate into the ground water in that area.

The second and third ground water plumes were small in comparison. The second one, located north of Building 181 in the northeast portion of the Site, was associated with a hand degreasing maintenance area. The third one, located south of Building 180, was attributed to the loading and unloading of solvent materials.

The fourth and largest plume covered about one and three-quarter acres primarily in the area of Building 120. Its highest concentrations coincided with the soil contamination beneath Building 120, and there was a pathway from the soil contamination in the area of the vapor degreaser maintenance pit to the water table. Additionally high concentrations in the north end of this large plume were associated with the location of the aboveground solvent storage tank outside Building 166. The sources of this plume were primarily identified as the operation of the vapor degreasing tanks, the maintenance (emptying and filling) of those tanks, and leaks or spills related to the storage of new and used solvent.

During the decades of operation, TDY used thousands of gallons of solvent annually at the Site. TDY disposed of these solvents into the sanitary sewer and introduced them into the environment as a result of its general operation and maintenance practices of the Site. These solvents will biodegrade in the environment over time and the total amount of solvent introduced to the environment is unknown. However, the quantity dispersed through-out the Site requiring remediation at the time manufacturing operations ceased was estimated to be approximately the equivalent of one 55 gallon drum.

These solvents degrade through various states to dichloroethene, then vinyl chloride and eventually into ethane, a nontoxic gas. The natural degradation rates of the solvents in the ground water at the site was slow due to low levels of organic carbon, high levels of sulfate or nitrate and low populations of the correct microbes. In situ bioremediation was used to remediate the groundwater contamination by the introducing dehalococcoide organisms to the groundwater to promote the dechlorination process. As a result, the degradation rates were accelerated and at the time of trial the groundwater remediation goal had been achieved for over 95 percent of the area, with ongoing efforts at the southern tip of the plume identified in the vicinity of the sanitary sewer line by Buildings 131 and 242.

### 3. Polychlorinated Biphenyls (PCBs)

PCBs were manufactured in the United States by the Monsanto Chemical Company. For many years they were added to fluids and other materials because they do not burn or conduct electricity, are chemically inert, and are highly resistant to heat, acids, caustics and oxidation. They were used to provide plasticity and durability to concrete, joint compounds, other building materials, paints, varnishes, lacquers, waxes, rubbers, and adhesives. Monsanto made 209 different PCB congeners, the mixtures of which were called Aroclors. Each Aroclor had slightly different chemical properties and preferred applications, including in dielectric fluids, hydraulic fluids and cutting oils, paints and building materials.

Data collected in the late 1960s indicated that PCBs bioaccumulate in plant and animal tissue and might be carcinogenic. In

approximately 1972, Monsanto discontinued manufacturing PCBs for use in open systems. In 1977, Monsanto also discontinued production for use in closed systems, e.g. electrical transformers and capacitors. In 1979, PCBs were regulated under the Toxic Substances Control Act, limiting their use to transformers and phasing out that application as well.

PCB contamination at the Site was identified primarily in the sediment in the storm water conveyance system beneath the plant that drains into the Convair Lagoon and San Diego Bay. The potential sources of this PCB contamination, with the exception of dielectric fluids, were much debated at trial and there was little, if any, direct corroborative evidence to identify the attributable source materials.

The potential primary sources of PCB containing fluids at the Site were identified as the dielectric fluids used in transformers and capacitors, and hydraulic oils and cutting oils used in the machining equipment and processes. With regard to the transformers and capacitors, the presence of PCBs in the dielectric fluids of these closed systems was not disputed. Nor was it disputed that during the years TDY operated at the Site, dielectric fluids occasionally leaked from these closed systems.

The presence of PCBs in the sediment at the Site inferentially supports the conclusion that they were also employed in hydraulic oils and cutting oils used in manufacturing processes, but there was no direct evidence of what PCBs were in these fluids, when these fluids were used, and in what quantity. No Government specifications or TDY manufacturing documentation was identified that required the inclusion of PCBs in these industrial fluids. It was, however, likely that these standard manufacturing fluids contained PCB additives up to 1972.

There was also circumstantial evidence that building materials, joint compounds, and paints used at the Site likely contained PCBs that also contributed to the contamination. But again, there was no direct evidence of the amount these sources contributed to the contamination. The significant presence of PCBs in the sediment of the storm drains that ran beneath the plant, however, supports a finding that, in addition to the PCB containing dielectric fluids, TDY used other PCB containing fluids and materials at the Site during the first four or five decades of operations there. By December 31, 1990, no PCB-containing equipment was in place or stored at the Site.

### a. Transformers and Capacitors

There were approximately 19 PCB-containing transformers located in ten vaults throughout the Site that distributed power to the manufacturing operations. These PCB-containing transformers contained in the electric vaults were removed between January 12, 1986 and December 10, 1988. Some of these transformers were supplied and owned by the Government prior to 1979.

Regardless of ownership, TDY was responsible for the transformer maintenance. Transformers are closed systems, but over time, as they aged, the transformers leaked dielectric fluid. TDY maintenance was responsible for cleaning up the leaks, making repairs to transformers to avoid further leaks, replenishing the dielectric oils in the transformers and maintaining the transformer vaults so fluids would not migrate into the environment.

The evidence regarding the significance of the transformer fluids as a source of PCB contamination was in conflict. There was no evidence that one or more transformers at the Site ever ruptured resulting in the dielectric fluid being released in large quantities. TDY personnel testified there were leaks from the transformers, but described them as modest, a drop or

two or three, something very small in nature, not sufficient to migrate.

Despite that characterization, TDY contended that there was a continuous release of sufficient amounts of dielectric fluids containing PCBs from the transformers such that they ended up in the plant's storm water conveyance system, contaminating the sediment in the storm drains. After the use of PCBs in transformers became regulated in 1979, TDY placed concrete curbs—berms, around the transformer vaults to prevent leaks of transformer dielectric fluid from escaping into the surrounding areas. Rainwater occasionally accumulated in these berms, and some amount of contaminated water from the enclosures still entered the storm drain system. The contamination was therefore the cumulative result of maintenance practices that failed to contain leaking fluids and properly store dielectric oils used to replenish the transformers, the mishandling of dielectric oils when transformers were serviced and replenished, and the improper storage of transformer equipment during removal and disposal, that allowed these PCB fluids to accumulate and ultimately enter the storm water conveyance system.

Capacitors were used at the Site to power spot welders. Capacitors are electrical devices that store a charge of electricity and discharge it to provide high voltage for various purposes. Some of the spot welder capacitors contained dielectric fluids with PCBs. Like transformers, capacitors are closed systems and as they age can be subject to leaks. For cost reasons, a leaking capacitor would be replaced, not repaired. To the extent leaks of dielectric fluids from capacitors migrated into the storm drains, it would have been the result of poor maintenance or improper storage and disposal of leaking capacitors. Site contamination attributed to this source was however presumed to be small.

### b. Machine Oils

Building 120 was the primary machine shop. Hydraulic fluids were present in the high pressure hydraulic presses used in the machine shop. A particular Aroclor 1248, found in the sediment in the storm water conveyance system, was recommended by Monsanto as an additive for hydraulic fluids. There was no documentary evidence that the hydraulic fluids actually used at the Site contained this Aroclor, but its use was promoted as an additive in these fluids up to 1972. The presence of the PCB mixtures identified in the sediment creates a reasonable inference that the fluids in the hydraulic presses at the plant contained PCBs.

Although the fluids in the presses are essentially in a contained system, under the extreme pressures of operation, a crack or failure of a hose, piping or connection would cause a release, in the form of a leak or spray. Trial testimony indicated that such releases were common and that as a result, the hydraulic fluid would land onto the equipment and factory floor.

Cutting oils were used as lubricants and coolants for machining operations. They were applied directly to the interface between the tooling, such as a cutting blade, and the metal being cut into a part. These oils were employed in machining operations using machines such as lathes, milling machines and drills. Prior to the ban of PCBs in open systems, PCB additives were used in cutting oils in the machining of high alloy steels to prevent overheating and to make smooth cuts.

Monsanto recommended Aroclor 1254 as an additive for cutting oils for its heat resistant characteristics. There was no documentary evidence that the cutting oils used at the Site contained this Aroclor, but the presence of the PCB mixtures identified in the storm drain sediment creates a

reasonable inference that this Aroclor was used at the Site, most likely in cutting oils.

In the normal operation of cutting tools, some of the cutting oil was thrown off the blade as a liquid or vapor. Overflow was captured in reservoirs, but some releases landed on the equipment, the material being cut and the floor adjacent to the machine tool. As materials were machined, scrap chips of the materials were generated. Those chips also had residue of the cutting oils on them.

TDY required the workers clean up between shifts. The scrap chips were swept up from the machine surfaces and the floor and deposited in carts for recycling. These scrap chips had cutting oil residue on them that accumulated in the carts. The carts were commonly left in open areas, exposed to the weather and the accumulated PCB contaminated oil residue was allowed to leak to the ground and/or road surfaces and ultimately enter the storm drains.

Machinery was wiped down between shifts. Any releases or spillage of machine oils (hydraulic fluids and cutting oils) were cleaned up using absorbent materials that were then disposed of in trash cans or barrels or swept into sumps in the factory floor, although some residue remained. Until the early 1970s, when EPA compliance standards directed otherwise, TDY supervisors directed the workers to hose down the remaining residue into the drains. This practice resulted in PCB contaminated residue entering the storm drains and the PCBs settling into the sediment.

The use of PCBs in open systems, including in hydraulic and cutting oils, was discontinued in 1972. By the mid–1970s, TDY's machine shop maintenance practices regarding the handling and disposal of the oils used in the machining processes should not have contributed to any further PCB contamination at the site.

#### c. Building Materials

There was evidence regarding building materials, such as paint, caulking and joint compounds contributing to the PCB contamination. Although the significance of these materials as a source of contamination was disputed, there was evidence that these materials contained PCBs. TDY witness Williams opined in an expert report that the general deterioration of the Site, particularly after the operation closed and regular maintenance was discontinued, contributed to the ongoing PCB contamination of the storm drain sediment. In his 2006 report, Williams stated that after operations ended and regular maintenance ceased, ongoing PCB contamination could have been reduced, if not eliminated, by the demolition and removal of the buildings and structures at the Site. By allowing the Site to stand without maintenance for a number of years, PCB contaminated materials (dust, eroded particles, paint chips) continued to migrate into the storm drains and contaminate the sediment.

#### d. PCB Remediation Efforts

The focus of the PCB remediation is the removal of accumulated contaminated sediment in the Site's storm water conveyance system. The system consisted of six major storm drains, four of which emptied into the Convair Lagoon and two of which emptied into San Diego Bay. These storm drains had tributaries that fed into them from across the Site including the downspouts from the roofs of the Site buildings as well as continuations from the neighboring airport and other manufacturing sites. PCBs were detected in the sediment in each of the storm drains, but the two that had the most significant levels of contamination were the 30–Inch East drain, which was located to the east side of Building 120, and the 60–Inch drain, which ran directly beneath the center of Building 120.

Both of these storm drains emptied into the Convair Lagoon.

Initial concerns regarding PCB contamination in the Convair Lagoon were raised in the late 1970s and early 1980s, particularly as part of the State Mussel Watch Program. The RWQCB investigated potential sources, and in 1986, the RWQCB issued a Cleanout and Abatement Order ("CAO") requiring TDY to clean out the storm drains' catch basins within its Site. The CAO was amended over subsequent years, and TDY was eventually required to design, construct and monitor a sand cap to isolate the PCB contamination in the Convair Lagoon from the environment. The cap was completed in 1998 covering seven acres in the lagoon with gravel placed over the sediment and a two-foot sand cap placed over that to contain the contaminated sediment. The CAO, as amended in 1998, required that the cap be monitored annually and that TDY sample and analyze the sediments in the storm drain systems that discharge into the lagoon, specifically the 60–Inch and 30–Inch East storm drains, for PCB concentrations levels in excess of 4.6 mg/kg.

Starting in 1986, TDY periodically investigated for PCB concentrations and cleaned the Site's storm drains. The 54–Inch storm drain which is at the western most side of the property was cleaned three times between 1986 and 1991. Based on 2002 monitoring samples taken in accordance with the 1998 amendment to the CAO, the 54–Inch storm drain was not considered a source of continuing PCB contamination in the Convair Lagoon. There was no cleanout documentation for the 30–Inch West drain, which drained the parking lot on the southwest side of the Site, but based on 2002 monitoring samples, it too was not considered a source of PCB contamination in the lagoon, historically or at that time.

The 60–Inch storm drain system is in the center of the Site and ran directly under Building 120. It is a continuation of a storm drain system that services properties north of the Site, including the former General Dynamics Lindbergh Field property and the San Diego Airport Lindbergh Field. It then continues under the Site and empties into the Convair Lagoon. The 60–Inch storm drain system drains approximately 67 acres, of which approximately 20 were on the Site. Concentrations of PCBs in sediments in the 60–Inch drain were historically less than in the 30–Inch East drain but greater than the other Site storm drains. Five cleanouts of the 60–Inch drain were conducted between 1986 and 1997, including a flushing and sediment removal prior to the completion of the lagoon capping project. Monitoring samples taken in 2002 indicated that PCB sediment contamination in the on-Site portions of this storm drain were generally less than the 4.6kg/mg required at that time for further remediation.

The 30–Inch East storm drain system is in the eastern central part of the Site and ran along the eastern side of Building 120. This system drained the Site property into the Convair Lagoon and did not connect to neighboring properties. This system had the highest concentrations of PCBs. Between 1986 and 1997, multiple cleanouts of the main line and catch basins were done and the concrete main line was replaced with PVC pipes. Soils along the storm drain alignment were also removed and sent for disposal. In 1997, sediments were removed at the outfall into the Convair Lagoon prior to the completion of the lagoon capping project. Monitoring samples taken in 2002 indicated that the cleanouts performed since 1986 had reduced concentrations in the 30–Inch East drain to less than the 4.6 mg/kg action level.

In 2004, the RWQCB issued a new CAO for a comprehensive site assessment to investigate and characterize potential contaminates, including PCBs, requiring remediation. Sampling data of the sediments in the Site's storm water conveyance system, taken in 2005 through 2007 in conjunction with that investigation, indicated that additional remediation of PCB contamination at the Site was required, in part due to the decrease to "non-detect" as the action level.[6] The most significant amount of contaminated sediment after 2002 was detected in the 60–Inch drain. Contamination identified in this drain in the 2005–07 sampling appeared to be greater than it was in the 2002 sampling.

In the early 1970s, TDY stopped using PCBs in its manufacturing processes at the Site, so by the mid–1970s no manufacturing operations were being performed at the Site that should have resulted in the introduction of new PCB contamination to the storm water conveyance system. By the end of 1990, there was no PCB-containing equipment in place or stored at the Site. Thus, after the significant cleanout efforts from 1986 to 1997, the amount of contamination should have decreased, yet the levels of contamination in the sediment in the 60–Inch drain appeared to increase from 2002 to 2005.[7]

The 60–Inch drain collects runoff from the broadest area of the storm system. PCB contaminated source material from across the Site would therefore most likely end up in the 60–Inch storm drain. It is a reasonable inference that the general deterioration and lack of maintenance of the property after TDY returned it to the Port

District was a likely new source of PCB contamination, as TDY's expert opined.

### D. Equitable Allocation under CERCLA

■ Congress enacted CERCLA in response to the serious environmental and health risks posed by industrial pollution. *United States v. Bestfoods,* 524 U.S. 51, 55, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998). The statute was designed to promote the timely cleanup of hazardous waste sites and to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination. *Burlington N. & Santa Fe Ry. Co. v. United States,* 556 U.S. 599, 602, 129 S.Ct. 1870, 173 L.Ed.2d 812 (2009). CERCLA allows private parties to recover the costs of cleaning up hazardous wastes from several categories of PRPs. 42 U.S.C. § 9607(a)(1)-(4). TDY seeks to recover the cleanup costs it incurred, and will incur, at the Site from the Government. The Government filed a counterclaim requesting the court determine the allocation of liabilities between them pursuant to CERCLA § 113(f)(1).

■ "In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines appropriate." 42 U.S.C. § 9613(f)(1). "This language gives district courts discretion to decide what factors ought to be considered, as well as the duty to allocate costs according to those factors." *Boeing Co. v. Cascade Corp.,* 207 F.3d 1177, 1187 (9th Cir.2000).

---

**6.** Further remediation efforts for PCB contamination in the Site's storm water conveyance system after the 1986–1997 cleanout were in part necessitated by the RWQCB's adjustment of the remediation standard for PCBs. The 1998 CAO did not require remediation action at levels of 4.6 mg/kg or less. The 2004 CAO required remediation levels to "non-detectable" amounts.

**7.** Although off-site sources and tidal influences on the 60–Inch drain were suggested as causes for the ongoing significant levels of PCBs in that drain, the evidence was at best inconclusive.

■ There is no predetermined list of factors to be applied in determining the equitable allocation of response costs. The "Gore Factors"[8] are frequently referenced as factors to be considered in the equitable allocation of costs. These factors include:

1. The ability of the parties to demonstrate that their contribution to a discharge, release or disposal of a hazardous waste can be distinguished;

2. The amount of the hazardous waste involved;

3. The degree of toxicity of the hazardous waste involved;

4. The degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste;

5. The degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous wastes; and

6. The degree of cooperation by the parties with Federal, State or local officials to prevent any harm to the public health or the environment.

*Envtl. Transp. Sys., Inc. v. ENSCO, Inc.*, 969 F.2d 503, 509 (7th Cir.1992). The Court, however, is not limited to these factors, which may or may not be appropriate in a given situation. *Boeing*, 207 F.3d at 1187.

■ In any given case, "a court may consider several factors, a few factors, or only one determining factor ... depending on the totality of circumstances presented to the court." *Envtl. Transp.*, 969 F.2d at 508. Among the factors which may be

considered include the relative fault of the parties. *Id.*

Among the Gore Factors, the Court finds, in the context of this case, the most applicable concepts are expressed in factors 1 and 4, the contribution and involvement of each party in the discharge, release or disposal of hazardous material and in factor 5, the care exercised by the parties with respect to the materials concerned. These are the factors that address who was responsible for the contaminants getting into the environment—in essence, who was at fault.[9]

■ In assessing that fault, the Court considers the respective roles of the parties as defined by CERCLA, and then how in the context of those roles each party contributed to the contamination. The evidence at trial established that both the Government and TDY were "owners of facilities." More significantly, the Court finds the evidence also established that TDY was the "operator" of the Site under CERCLA, managing, directing and conducting operations having to do with the release, leakage or disposal of hazardous waste, and making and implementing the decisions about compliance with environmental regulations. Given the nature of the contamination, the Court finds that TDY's role as the Site operator, responsible for the handling, storage and disposal of the contaminants at issue in this case, is the most relevant factor in allocating costs.

### 1. The Government as a Past Owner under CERCLA

■ On TDY's motion for summary adjudication, the Court found the Govern-

---

8. The Gore Factors are a list of factors from a failed proposal to amend CERCLA made by then-Representative Al Gore, as the basis of allocating liability. *Boeing*, 207 F.3d at 1187.

9. A focus on the assessment fault is also reflected in two of the "critical factors" enumerated by Judge Torres ("the Torres Factors") in *United States v. Davis*, 31 F.Supp.2d 45, 63 (D.R.I.1998) (the extent to which cleanup costs are attributable to wastes for which a party is responsible, and the party's level of culpability).

ment to be a PRP under CERCLA as a "past owner" of a "facility"[10] at the time of disposal of any hazardous substance. 42 U.S.C. § 9607(a)(2). [Doc. No. 169.] The evidence at trial confirmed that for times during the lengthy relationship between TDY and the Government, the Government owned equipment at the Site used in the manufacture, assembly and testing of the products made at the Site. The evidence at trial also confirmed that hazardous substances of concern were disposed of during the time the Government owned facilities, i.e., equipment, some of which may have been a source from which a disposal (discharge or leakage) may have occurred at the Site.

Despite the substantial amount of evidence introduced at trial and in the post-trial briefing, what tools and equipment the Government owned, and when, and how they related to the contamination, remained an incomplete picture. The paper trail reflecting ownership of equipment and tools was patchy and vague. The testimony and records reflect however that the Government-owned equipment at the Site was either removed or sold to TDY in March, 1979, twenty years before operations ceased. Therefore, the Government's liability, based on the Government being an owner of facilities at the Site as defined by CERCLA, is limited to contamination that occurred during the period between 1939 and 1979.

TDY offered evidence it argued demonstrated that the Government owned the actual chemicals and industrial fluids containing the contaminants that TDY used while operating the manufacturing plant on the Site. This evidence was disputed,

inconclusive and ultimately unhelpful in an analysis of contribution based on ownership of facilities. Although progress payments that included indirect costs, for example, purportedly gave the Government title to the chemicals during contract periods, title to these products reverted to TDY at the conclusion of a contract.

■ Regardless, ownership of the hazardous substance is not dispositive. In assessing the roles of the parties before the Court, the critical issue for an equitable allocation under CERCLA is control over the disposal of the contaminants at the Site, not which party held title to the contaminants. *See e.g., Lockheed Martin Corp. v. United States,* 35 F.Supp.3d 92, 134–135 (D.D.C.2014) (holding that "the critical issue is not ownership in the first instance, but rather the parties' respective control over the disposal" of hazardous substances).

Similarly the Court does not afford much weight to the simple fact of ownership of "facilities" in assessing responsibility. It is undisputed that the Government owned equipment at the Site, some of which is related to the contamination. For example, the Government for some period owned electrical transformers installed at the Site. There was also evidence that prior to 1979, the Government owned hydraulic presses, chemical processing tanks and other machining equipment used by TDY to manufacture products. TDY also owned equipment related to the contamination at times simultaneous with the Government's ownership, and owned all of it after 1979. But it was not the equipment itself that caused contamination. Rather it

10. "Facility" is defined as "any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft" or "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." 42 U.S.C. § 9601(9)(A) and (B).

was the manner in which equipment was operated and/or maintained that resulted in hazardous substances being introduced to the environment. Consequently, the Court does not consider who owned title to a piece of equipment to be as relevant as which party had control over the handling and disposal of the contaminants. *See, e.g., id.,* at 135.

## 2. The Government was not an Operator under CERCLA

■ As stated above, the Government's liability in this case is predicated on the summary adjudication that the Government was an "owner of facilities" (specifically various tools and equipment) at the site, not that the Government was an "operator" of the site.[11] TDY did not seek an adjudication that the Government was an "operator" of the site as defined by CERCLA. Nevertheless, TDY made significant efforts at trial to portray the Government as the site's "operator," controlling and directing all the manufacturing operations at the plant that resulted in the contamination.

■ "For purposes of CERCLA's concern with environmental contamination, an operator must manage, direct or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations" *Bestfoods,* 524 U.S. at 66–67, 118 S.Ct. 1876. In circumstances where the Government was found to be such an "operator" due to its control or management, in whole or in part, of the disposal practices at a site, courts have found it equitable to burden the Government with a substantial portion of the remediation expenses. The evidence in this case however did not establish that the Government was an "operator" of the Site under CERCLA.

Although TDY demonstrated that the overwhelming majority of the products it manufactured during the life of the plant were the products of defense contracts or subcontracts, made to exacting government specifications, the evidence was not persuasive that the Government managed or directed the operation of the Site, particularly with regard to "operations having to do with the leakage or disposal of hazardous waste." *Id.*

TDY personnel testified that Government personnel for quality control ("DCAS personnel") and audit functions ("DCAA personnel") were regularly present at the Site to inspect and verify that the contracted parts were being made in compliance with the technical engineering requirements and contract requirements. The Government provided specifications ("MIL specs") detailing technical compliance requirements. Some MIL specs required the use of chromium compounds and chlorinated solvents in the processing of certain parts to manufacture a proper quality product. Although MIL specs directed the use of these chemicals to make conforming products, TDY did not demonstrate that MIL specs directed the actual processing operations or, more significantly, the plant maintenance procedures that primarily resulted in the pollution.

Government personnel present on the Site did not supervise the plant management or have responsibility for plant maintenance or waste management. Govern-

---

11. TDY made no serious effort to demonstrate that the Government should be liable as an "arranger" under CERCLA. An "arranger" under 42 U.S.C. § 9607(a)(3) is "any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person...." No evidence was presented that the Government directly or indirectly arranged for the disposal of wastes at the TDY plant.

ment personnel had no responsibility for the handling, distribution, use or disposal of chemicals or materials contaminated with chemical waste at the Site. The Government had no responsibility for the implementation and enforcement of environmental compliance policies and procedures.

TDY made sweeping attempts to characterize the Government as the overarching owner and operator of the Site throughout its decades of manufacturing by emphasizing the military defense-related nature of the products produced. TDY also offered a significant amount of testimony about the Government's financing of industrial plants during WWII to facilitate the production of national defense requirements and historical evidence regarding the Government's ability to commandeer manufacturing plants for the war effort. TDY further emphasized that after WWII, the Site continued to provide parts and aircraft for military defense, often under top secret conditions, thereby inferring that throughout its operation the plant was presumptively operated by the Government.

The actual evidence, however, did not support the characterization that the TDY plant was directly and substantially operated by the Government. There was no evidence that TDY was ever ordered, coerced or forced to operate as a military defense plant. The situation at the TDY plant was not similar to the California synthetic rubber plants at issued in *Cadillac Fairview/California, Inc. v. Dow Chemical Co.*, 299 F.3d 1019, 1022 (9th Cir.2002) (Dow operated the government-owned plan as the "agent" of the United States at the "expense and risk" of the United States), or the Virginia high tenacity rayon plant at issue in *FMC Corp. v. United States Dep't of Commerce*, 29 F.3d 833, 836–37 (3rd Cir.1994) (*en banc*)(the United States diverted American Viscose from its previous commercial endeavors and directed the plant to produce high

tenacity rayon, and to ensure the manpower to run the facility obtained draft deferments for personnel, directed workers in other industries to come to the plant, provided housing for additional workers, and managed and participated in the supervision of the workers to ensure productivity).

TDY voluntarily and actively sought the aviation contract work and financial inducements offered by the Government during WWII to build and expand its existing plant. Throughout its operating history, TDY repeatedly bid on such contracts to its financial benefit. There was no evidence the Government ordered TDY to take on the aeronautical manufacturing during WWII or at any time thereafter, or exercised "unrestricted control" over the operation.

TDY's generalizations of rigorous and direct Government control over all aspects of the plant operations were contradicted by TDY's own witnesses who testified that TDY controlled the production processes used to manufacture the parts through local process specifications. Manufacturing Process Documents ("MPDs") were prepared by TDY employees, to implement the processes needed to yield conforming parts. Although these MPDs were subject to DCAS review and approval to confirm that processes would result in a conforming end product, the evidence did not show that DCAS personnel directed or managed production processes. Production processes were controlled by TDY, were generally performed in accordance with industry standards of the time, and TDY personnel testified that the company never violated or disregarded its own procedures or specifications during operations at the Site.

█ Specifically how chemicals were managed, contained and disposed of during operations at the Site was TDY's responsibility. The evidence did not demonstrate that these procedures were set forth of

MIL specs, or even that they were enumerated in the MPDs. There was no evidence they were controlled or directed by the Government. DCAS personnel observed and accepted TDY's management procedures and policies regarding the use and disposal of hazardous materials, but the evidence did not support a finding that the Government managed those practices. "DCAS' approval, without more, of process standards does not constitute the degree of 'direct[ion]' necessary to establish operator liability." *Lockheed*, 35 F.Supp.3d at 146 (the government is not an operator simply because DCAS representatives approved process standards that included disposal processes, observed certain production processes, and conducted periodic safety inspections).

TDY employees testified that under the direct supervision of TDY management, they had responsibility for the use, storage and disposal of the hazardous materials employed in the production of the contracted parts. TDY employees testified they had direct responsibility for the implementation and enforcement of environmental compliance policies and procedures.

"*Bestfoods* requires that an operator 'make the relevant decisions' regarding the disposal of hazardous wastes 'on a frequent, typically day-to-day, basis'." *Lockheed*, 35 F.Supp.3d at 121, citing *City of Wichita, Kansas v. Trustees of APCO Oil Corp. Liquidating Trust*, 306 F.Supp.2d 1040, 1055 (D.Kan.2003) (collecting cases). Applying the *Bestfoods* definition of an operator under CERCLA, TDY did not establish that the Government functioned as an operator at the Site. *See generally Lockheed*, 35 F.Supp.3d at 150 (operations in performance of government contracts or subcontracts and the government's pervasive influence over the general activities at a site does not alone make the government an operator under CERCLA), citing *Coeur D'Alene Tribe v. Asarco Inc.*, 280

F.Supp.2d 1094, 1127–30 (D.Idaho 2003) (same), and *United States v. Iron Mountain Mines, Inc.*, 987 F.Supp. 1277, 1287–88 (E.D.Cal.1997) (same).

The Government's liability at this Site was as a "past owner of facilities." TDY's liability was as an "owner of facilities" and "operator." Viewing each party in the context of those roles the Court considers to what extent the Government and TDY should each be held accountable for the Site contamination.

### 3. The Contribution, Involvement and Care of the Parties

The contaminants at issue in this case entered the environment as a result of manufacturing operations, maintenance and disposal policies and procedures, and storage practices on the Site. The contamination occurred over the span of decades. The hazardous nature of the contaminants was generally unknown for many of those years. For example, TDY's disposal of chlorinated solvents into the sanitary sewer was in accordance with municipal ordinances up until mid–1970s. Similarly, the hazardous nature of PCBs was not discovered until the late 1960s, after they had been in common use for decades. After the hazardous nature of these materials became known, TDY took steps to contain and eliminate their release into the environment.

This is not a case about willful disposal of hazardous wastes in disregard of the safety of the environment or in violation of the law. It is about general manufacturing processes and "housekeeping" practices that allowed what came to be recognized as hazardous substances to accumulate in the ground and flow into the storm systems.

### a. The Chromium Contamination

 The chromium contamination was clearly related to the operation of the pro-

cessing lines designed to impart corrosion resistance to aluminum and aluminum alloy metal parts. The use of chromium solutions was required by Government specifications and the actual processing tanks may have been owned by the Government at certain periods. But neither of these facts account for why chromium contamination was detected in the soil under the concrete slabs of Buildings 120 and 158.

Rather, the chromium contamination resulted directly from TDY employees allowing the parts being processed, as they were manipulated from tank to tank, to drip chromium solutions to the factory floor. The solutions were visibly staining the floor and apparently over time permeated the concrete and migrated down to the soil beneath, where due to their nature they did not degrade but accumulated. The failure to avoid, control and clean up these drips, and spills that occurred during the maintenance and replenishing of the tanks, was solely the responsibility of TDY employees. Even if a certain amount of release was inherent in the operation of the chromium processing line, it was TDY's responsibility to contain it and clean it up before it escaped the factory floor. TDY did not do so, instead leaving the chromium to soak into the concrete slabs and work its way down into the soil.

The Government's ownership of processing equipment did not cause this contamination, nor was it the inevitable result of the requirement that chromium processing be employed in the manufacture of the parts. The contamination discovered under the concrete slabs of the TDY buildings got there because TDY personnel, under the direction of TDY management, did not actively and effectively prevent spills of chromium solutions, or remove the spilled solutions promptly from the floor during and after the processing of parts. Accordingly, the Court finds TDY solely

the responsible party for this contamination and its cost of remediation.

### b. The Chlorinated Solvent Contamination

Parts manufactured by TDY for the Government had to be cleaned to remove grease and dirt that accumulated during the production process. The Government recommended the use of chlorinated solvents to degrease the parts and owned vapor degreasers used by TDY to perform that operation. But neither of those facts are the direct cause of the contamination. Similar to the chromium processing, it was not specifically the process of vapor degreasing that caused chlorinated solvents to end up in the soil and ground water at the Site. Rather, the cause of the chlorinated solvent contamination was TDY's careless storage practices and its failure to contain and clean up spills and drips of the liquid solvent used in the manufacturing process.

Chlorinated solvent contamination in a number of the Site areas was unrelated to the operation of the vapor degreasers, and was identified as directly attributable to spills that from the Site's storage tank allowing solvent to go directly into the ground. These spills were also TDY's sole responsibility.

Additionally, contamination was found at hand degreasing stations where solvent was not contained by the TDY employee performing the degreasing. TDY employees released solution to drains or openings in the factory floor and allowed it to permeate to the soil beneath. The resulting contamination is therefore TDY's responsibility.

A large amount of the ground water contamination resulted from cracks and breaks in the sanitary sewer line that TDY historically used to dispose of solvents by permit. TDY was responsible for the maintenance of that line, and TDY's failure

to properly maintain the line directly resulted in contamination of the soil and ground water. There was no evidence the Government had any ownership of the sewer or storm water lines at any time.

Although the largest contaminated area corresponded to the operation of the vapor degreasers, the solvent vapor created by the degreasing operation was not attributed as the source of the contamination. In the manipulation of the parts being degreased, TDY operators of the degreasing equipment removed parts dragging the liquid solvent from the tanks and allowed the liquid to drip to the factory, or the maintenance pit, floor. That solvent was not contained or promptly cleaned up, but was allowed to enter drains or soak through the floor and permeate the soil beneath eventually finding its way into the ground water. Additionally, when the tanks were discharged and refilled with solvent, spills were not promptly attended to and were allowed to escape into the environment.

The Court recognizes that for decades there was no perceived urgency to clean up solvent as its hazardous nature was unknown. That notwithstanding, it was TDY's responsibility to keep a clean and safe workplace and it was TDY's failure to minimize and clean up solvent discharge that was released from the degreasing equipment that resulted in the contamination. The Court finds TDY the sole responsible party for this chlorinated solvent contamination and the cost of remediation related thereto.

### c. The PCB Contamination

■ The PCB contamination in the storm drain system had many potential sources. Transformers were identified as a primary source of the PCB contamination, likely because it was undisputed these closed systems contained PCBs and the Government at one time owned and provided this Site equipment. The testimony however from TDY personnel undermined the contention that the transformers were a significant source of the contamination. First, the leaks were described as minimal. Second, the transformers were regularly inspected and maintained, so that any leaks were promptly attended to and repaired. Third, TDY constructed berms to contain any leaks so the fluids would not migrate into the storm drains. Consequently, based on TDY's own evidence, it would be unlikely the transformers meaningfully contributed to the PCB contamination on the site.

■ On the other hand, if the transformers were in fact a significant source of contamination, the fault lies with TDY. Such contamination would likely be attributable to inadequate maintenance and repair by TDY, such as failure to promptly clean leaks and repair the source of the leak, construction of berms that were insufficient to contain leaks, and not taking adequate steps to prevent fluids that accumulated in the berms to flow into the storm drains. These maintenance procedures and practices were TDY's responsibility so if the transformers were a significant cause of the PCB contamination it was TDY's actions that resulted in the migration of PCBs into the storm drains.

■ Hydraulic fluids and cutting oils were also identified as a potential significant source of the PCB contamination. Both of these fluids were described as released in the regular operation of machining equipment, equipment possibly owned by the Government. These fluids were not released directly from the equipment to the storm drains however. Rather, the fluids were released into the work space, and it was the responsibility of the TDY employees to clean that area between shifts to capture and remove these fluids and their residues. As part of the maintenance practice, employees were also in-

structed by TDY supervisors to wash these residues into the storm drains. Similarly, the scrap materials with cutting oil residue were not properly contained and disposed of to minimize release of PCB-containing oil into the environment and storm water system. Accordingly, the introduction of oils with PCBs from the factory equipment and floor, and scrap materials, into the storm drains was the direct result of TDY inadequate maintenance practices.

Finally, while the PCB contamination attributable to building materials, resulting from the deterioration of the Site after it closed, may not be solely TDY's fault, it certainly was not the Government's responsibility.

Long after the Government no longer owned equipment at the site and PCB containing fluids were discontinued from use, significant efforts and dollars were spent to clean up PCB contamination in the storm water system (much of which was billed by TDY to the Government as an indirect expense). Despite those efforts, the level of PCB contamination in the storm water system increased from 2002 to 2005, resulting in additional remediation costs being imposed on TDY. The source of that increased and ongoing contamination cannot be attributed to equipment owned by the Government decades earlier and the Court does not find it equitable to shift any further costs of the PCB cleanup to the taxpayers.

### 4. The Government's Payment of Indirect Charges Is Not an Acknowledgement of Responsibility

■ Over the years that TDY performed contract work for the Government, when TDY incurred expenses to comply with environmental regulations, reporting obligations and remediation costs, it passed those costs on to the Government as indirect or overhead costs. Up until the plant closure, TDY burdened all government contracts with environmental expenses. A specific dollar amount was not provided for the expenses that TDY had passed on to the Government but up until 1999 TDY billed 90–100% of its environmental costs to the Government.[12] The testimony of TDY financial witnesses indicated that the costs incurred by TDY related to the cleanout and replacement of the storm drains were burdened to overhead and passed on to the Government until 1999.

TDY suggested that the fact that the Government accepted these indirect costs and paid them is an acknowledgement by the Government that it is responsible for all the remediation costs at issue in this litigation. The Court disagrees. Many industries incur expenses as a result of environmental compliance obligations and pass those costs on to their customers. In accepting this overhead component as part of the cost of the good or service provided, customers share the expense of protecting and preserving our environment for the benefit of everyone. It does not however follow that customers who pay these expenses are accepting responsibility for the polluting acts of the business. A consumer who pays a business's recycling fee as part of the invoice for his car's oil change is not acknowledging responsibility for remediation expenses if that company discharges oil or other pollutants into the environment. The Government's payment of TDY's environmental compliance expenses as overhead charges is not an acknowl-

12. The Convair Lagoon capping project was an exception. TDY submitted to the Government all the costs it accumulated as of 1996 with regard to the CAO for the Convair Lagoon PCB contamination. The Government objected, and TDY and the Government entered into a settlement regarding the Convair Lagoon cleanup. The Government paid $1 million of the expense, which was the equivalent of TDY's insurance deductible.

edgement that it is also responsible for costs TDY incurred due TDY's industrial practices that necessitated this remediation. The Court does not find that the Government's history of paying these indirect charges justifies shifting the remediation costs at issue in this litigation to the Government.

### 5. Benefits to the Parties

■ At trial TDY offered the opinion of Robert Zoch, Jr., on what factors the Court should consider for appropriate equitable allocation. Zoch essentially based his allocation opinion on the relative amount of Government versus private production that occurred over the 60 year life of the operation of the site, what he called a "volumetric theory of allocation." Zoch concluded that 90% or more of the TDY production was for the Government, and the use of the contaminants was necessary for the production of products for the Government, therefore 100% of the costs of cleanup should be allocated to the Government.

The Court rejects this "volumetric" theory of customer liability. Customers are not recognized as a PRP under the statute. The purpose of CERCLA is to hold responsible parties liable for the mess they make. Mr. Zoch's theory of allocation would provide no incentive for a polluting party to police its use and disposal practices. If simply asserting that use of contaminants was necessary in the production of a customer's product, so any environmental contamination resulting from the use of those substances is therefore the financial responsibility of the customer, the manufacturer would not have to take any responsibility for its actions. That is not putting the burden where it belongs.

TDY also offered the theory that when contamination is the result of services performed in support of a national defense program, an allocation of all or the vast majority of cleanup costs should be borne by the Government (i.e., the taxpayers). To this end, it compares this case to the circumstances of the Dow Chemical synthetic rubber plant in *Cadillac Fairview/California*, 299 F.3d 1019; the American Viscose high tenacity rayon plant in *FMC Corp.*, 29 F.3d 833; and the oil company aviation fuel refineries in *U.S. v. Shell Oil Co.*, 294 F.3d 1045 (9th Cir.2002). As discussed above, this was not a situation similar to *FMC Corp.* in which the United States commandeered the plant during WWII for the production of specific products and supervised the personnel. Nor is it akin to *Cadillac Fairview/California*, in which the United States was aware that a direct byproduct of the manufacture of the wartime essential product was a pollutant, and to advance its military objectives, the United States sanctioned or directed the disposal of those toxic wastes that later resulted in the remediation efforts and costs. *Id.*, 299 F.3d at 1024–25 (the government obtained monthly reports on the residues dumped and recommended disposing of wastes by getting them underground). In *Shell Oil Co.*, the United States admitted arranger liability for certain wastes at issue and the court further found that due to wartime demands the government refused to allocate the materials and resources necessary to reprocess avgas wastes so they were dumped. *Id.*, 294 F.3d at 1051. The situation in the present case is not comparable.

Nor does the Court find authority for a general rule that contracts for the production of military products automatically make the Government (i.e., the taxpayers) responsible for the polluting acts of the manufacturer. To the contrary, it is the intent of CERCLA to hold responsible parties accountable and not shift the burden of cleaning up the environment to the taxpayers. *Cf. B.F. Goodrich Co. v. Murtha*, 958 F.2d 1192, 1198 (2d Cir.1992) (by requiring responsible parties to pay for

cleanup efforts, CERCLA also ensures that the taxpayers are not required to shoulder the financial burden of a nationwide cleanup).

TDY supplied aeronautical products for the national defense throughout various military campaigns. The contract relationship between TDY and the Government was mutually beneficial. The Government benefitted from TDY's research and production and TDY received payment for its services and products. There was no evidence the Government received any benefit from TDY's manufacturing practices that caused the contamination. The national defense purposes for the products produced at the Site does not in itself justify making the taxpayers responsible for the costs of remediation at this site.

## V. Conclusion

For the reasons set forth above, the Court finds that TDY is liable under CERCLA as an owner of facilities and the operator of the Site for the contamination at issue in this litigation and the associated response costs. The Court further finds that although the Government was a past owner of facilities at the site, it was not the responsible party for the introduction of the contaminants of concern into the Site's soil, sediment and water that necessitated the remediation efforts. Considering the totality of the circumstances, the Court allocates 100% of the past and future response costs for the remediation of chromium, chlorinated solvents and PCBs at the Site to TDY.

Accordingly, on Count I of TDY's first amended complaint for recovery of past and future response costs from the Government and Count II of the first amended complaint for declaratory judgment that the Government is responsible for any future response costs, JUDGMENT should be entered in favor of the Government. Likewise, on Count I of the Government's

First Amended Counterclaim for an equitable allocation of the response costs JUDGMENT should be entered in favor of the Government, with 100% of the past and future remediation costs at the Site allocated to TDY.

TDY and the Government shall each bear their own attorney's fees and costs incurred in this action, except that the Government may submit a Bill of Costs pursuant to 28 U.S.C. § 1920 within the time allowed by law.

It is **SO ORDERED.**